FILED
CLERK, U.S. DISTRICT COURT

**MAY 1 3 2011**

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1 │ NICHOLS KASTER, PLLP
Rebekah L. Bailey, CA Attorney No. 258551
2 │ 4600 IDS Center
80 South Eighth Street
3 │ Minneapolis, MN 55402
Telephone: (612) 256-3200
4 │ Facsimile: (612) 215-6870
bailey@nka.com
5 │
NICHOLS KASTER, LLP
6 │ Matthew C. Helland, CA Attorney No. 250451
One Embarcadero Center, Suite 720
7 │ San Francisco, CA 94111
Telephone: (415) 277-7235
8 │ Facsimile: (415) 277-7238
Helland@nka.com
9 │
Attorneys for Individual and Representative Plaintiff
10 │
11 │ **IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**
12 │

13 │ **KENT FARMER,** as an individual
and as a representative of the
14 │ classes,

Case No. SA CV 11 - 739 (RNBx) CJC

15 │      Plaintiff,

**CLASS ACTION COMPLAINT
FOR DAMAGES,
RESTITUTION AND
INJUNCTIVE RELIEF**

16 │ v.

17 │ BANK OF AMERICA, N.A., BAC
HOME LOANS SERVICING, L.P.,
18 │ BANC OF AMERICA
INSURANCE SERVICES, INC.
19 │ and BALBOA INSURANCE
COMPANY,

(1) Breach of Contract

(2) Breach of Contract

(3) Fraud

(4) Unjust Enrichment

20 │      Defendants.

**(JURY TRIAL DEMANDED)**

21 │
22 │
23 │      Plaintiff Kent Farmer ("Plaintiff"), on behalf of himself and the

24 │ putative classes set forth below, and in the public interest, brings the

25 │ following Complaint against Defendants Bank of America, N.A. ("BOA"),

26 │ BAC Home Loans Servicing, L.P. ("BAC"), Banc of America Insurance

27 │ Services, Inc. ("BAISI") and Balboa Insurance Company ("Balboa")

28 │ (collectively, "Defendants").

## PRELIMINARY STATEMENT

1.     This is a case about Defendants' systematic violation of Plaintiff and other putative class members' legal rights.

2.     Plaintiff's form Homestead Lien Contract and Deed of Trust ("Homestead Lien Contract") with BOA expressly provides that BOA and BAC do "not require fire insurance" on Plaintiff's property.  A copy of the Homestead Lien Contract is attached hereto as Exhibit A.

3.     Despite the fact that their Homestead Lien Contracts explicitly relieve Plaintiff and class members of the duty of maintaining fire insurance, Defendants BOA and BAC nonetheless represented to Plaintiff and class members that such insurance was required.

4.     When Plaintiff and class members did not purchase such insurance of their own accord, BOA and BAC "force placed" insurance on them.  There is a provision in Plaintiff's mortgage agreement, which provides that **if** the borrower fails to provide required insurance, the lender may "take any action" to protect its interest, and charge the borrower for the "expenses" incurred in doing so.  As explained herein, however, Plaintiff and class members did not fail to provide required insurance because no insurance was required.

5.     Defendants BOA, BAC and Balboa force placed insurance on Plaintiff.  Plaintiff's force-placed policy was backdated to cover a period of time starting two months prior to the date on which the policy was actually placed.  Such backdating of force placed policies is a standard business practice of Defendants.

6.     The force-placed insurance was provided by Balboa, an insurance company owned by BOA and affiliated with BAC.  The insurance was force placed pursuant to the terms of a pre-negotiated master insurance policy issued by Balboa which covers force-placed insurance on all of BAC's

CLASS ACTION COMPLAINT

Texas loans.

7.     BAC required Plaintiff and class members to pay an exorbitant amount for this force-placed and backdated Balboa insurance—nearly three times the amount Plaintiff had paid for an equal amount of coverage from his prior insurer.

8.     Part of the premium Plaintiff paid was remitted to Defendant BAISI in the form of a commission, despite the fact that BAISI performed no or virtually no services in connection with this force placement because the force placement was done pursuant to a pre-existing policy that pre-determined the terms and provider of the force-placed policy.

9.     Based on Defendants' conduct as described herein, Plaintiff asserts:

     i.     A breach of contract claim against Defendants BAC and BOA for force placing insurance on Plaintiff in spite of the fact that no such insurance was required by his Homestead Lien Contract;

     ii.     A fraud claim against Defendants BOA and BAC for representing that insurance was required as a condition of Plaintiff's loan when in fact it was not.

10.     Plaintiff asserts these claims in Counts One and Three of his Complaint on behalf of a putative Texas Class of borrowers.  This class is defined without respect to whether Defendants force placed the insurance on class members or merely sent them form letters requiring them to purchase it themselves.  Because no insurance was in fact required as a term of class members' loans, Defendants breached their own loan agreements by requiring it, and committed fraud by claiming it was required.

11.     Plaintiff also asserts:

     i.     A breach of contract claim against Defendants

CLASS ACTION COMPLAINT

BAC and BOA for backdating insurance coverage and passing along the cost of exorbitant premiums as "expenses" when in fact these "expenses" were designed to enrich itself, and its affiliates Balboa and BAISI;

ii.     An equitable claim against Defendants BAC, Balboa and BAISI for unjust enrichment based on their practice of force placing exorbitantly priced, backdated and unnecessary hazard insurance.

12.    Plaintiff asserts these claims in Counts Two and Four of his Complaint on behalf of a putative Nationwide Class consisting of all persons who had loans with BOA and BAC and who paid for lender placed insurance, in whole or in part, within the applicable limitations period.

13.    Plaintiff and the Putative Classes seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Defendants' unlawful conduct as described herein**.**

## **THE PARTIES**

14.    Individual and representative Plaintiff Kent Farmer resides in Helotes, Texas, and is a member of the Putative Classes defined below.

15.    Defendant BOA is a national banking association headquartered in Charlotte, North Carolina.  BOA does business in the State of California and several other states throughout the country.  BOA is registered to do business in California with the California Secretary of State.

16.    BAC Servicing is headquartered in Calabasas, California. Defendant BAC is a subsidiary of BOA that services loans and lines of credit originated and purchased by BOA. These loans include Homestead Lien Contract loans in Texas, as well as and loans and lines of credit extended to California homeowners and homeowners nationwide.  At all relevant times, BAC Servicing's conduct was approved, authorized, enabled, and ratified by

BOA.  BAC is an affiliate of BAISI and Balboa.

17.     Defendant Balboa is headquartered in Irvine, California.  Balboa does business in the State of Texas and several other states throughout the country.  Balboa is a subsidiary of BA Insurance Group, Inc., which is a wholly-owned subsidiary of NB Holdings Corporation, which is a wholly-owned subsidiary of Bank of America Corporation.[1]  Balboa is a licensed provider of fire insurance in California.  Balboa is also a licensed insurance company in Texas and is authorized to provide, among other things, fire and casualty insurance in Texas.  Balboa is an affiliate of BAISI and BAC.

18.     Defendant Banc of America Insurance Services, Inc. is a corporation organized under the laws of Maryland with its principal place of business in North Carolina.  BAISI is a nonbank subsidiary of BOA and is an affiliate of Defendants BAC and Balboa.  BAISI is registered with the California Secretary of State and is licensed as an insurance agency in California, Texas, and numerous other states throughout the country.  BAISI is an affiliate of Balboa and BAC.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2).  Plaintiff is a citizen of the State of Texas, and Defendants are citizens of different states.  The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members of the each of the Putative Classes.

20.     Venue is proper here pursuant to 28 U.S.C. § 1391.  All Defendants regularly conduct business in California and reside in this

---

[1]  Bank of America has entered into a definitive agreement with QBE Insurance Group to sell the lender-placed and voluntary property and casualty insurance assets and liabilities of Balboa Insurance Company and affiliated entities to QBE.  This sale is scheduled to be completed mid-2011.

district.  Assignment of this action to the Western Division is appropriate.

**FACTUAL ALLEGATIONS**

**A.      BACKGROUND ON PLAINTIFF'S LOAN**

21.     On January 17, 2008, Plaintiff obtained a home equity loan from BOA in the amount of $117,608.00 secured by a lien on his homestead.

22.     BOA is the current lender-in-interest to Plaintiff's Homestead Lien Contract.

23.     BAC Servicing services Plaintiff's Homestead Lien Contract on behalf of BOA.  The current principal balance of Plaintiff's Homestead Lien Contract loan is less than $112,000, and he does not have any other loans or lines of credit secured by his property.

24.     Plaintiff is not in default on his loan, and is up to date on all payments.

25.     On January 17, 2008, Plaintiff signed a Homestead Lien Contract and Deed of Trust.  (Ex. A.)

26.     On January 17, 2008 Plaintiff also signed a Promissory Note. (Ex. B.)

**B.      PLAINTIFF'S LOAN EXPLICITLY DOES NOT REQUIRE HIM TO MAINTAIN HAZARD INSURANCE.**

27.     The second page of Plaintiff's Homestead Lien Contract contains the following provision:

> **PROPERTY DAMAGE INSURANCE**.   The following provisions relating to insuring the Property are a part of this Homestead Lien Contract:
> **Maintenance of Insurance.**  *Owner at Lender's request shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender.*

(emphasis added).

-6-

CLASS ACTION COMPLAINT

28.     Despite the proviso on the second page of the Homestead Lien Contract that the owner is required to maintain "fire insurance with standard extended coverage endorsements," there is language on the fifth page of the Homestead Lien Contract that creates an explicit exception to that requirement, stating that, **notwithstanding** the prior language, BOA and BAC do **not** require such insurance for loans made pursuant to Section 50(a)(6), Article XVI, Texas Constitution:

> **INSURANCE.**  *Notwithstanding any language to the contrary in this Homestead Lien Contract or in any Related Document, if this Homestead Lien Contract secures an extension of credit pursuant to Section 50(a)(6), Article XVI, Texas Constitution, Lender does not require fire insurance with standard extended coverage endorsements on the property.*  *However, if as of the date of this Homestead Lien Contract, Owner has in force such insurance on the Property, then all such policies covering loss or damage to the Property shall include a standard non contributory mortgagee clause in favor of Lender.*

(emphasis added).

29.     The Homestead Lien Contract, by its own explicit terms secures an extension of credit pursuant to Section 50(a)(6), Article XVI, Texas Constitution.  Indeed, the first page of the Homestead Lien Contract states:

**HOMESTEAD LIEN CONTRACT AND DEED OF TRUST**
**THE EXTENSION OF CREDIT EVIDENCED BY THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST IS THE TYPE OF CREDIT DEFINED BY SECTION 50(A)(6), ARTICLE XVI, TEXAS CONSTITUTION.**

30.     The Homestead Lien Contract says it extends the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution in no less than six separate places, twice on the first page, twice on the fourth page, and twice on the fifth page.

31.     The Promissory Note executed in conjunction with the Homestead Lien Contract also says it extends the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution.  It states:

**HOME EQUITY LOAN**.  *THIS LOAN IS AN EXTENSION*

CLASS ACTION COMPLAINT

*OF CREDIT OF THE TYPE DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION* and is made at an agreed rate authorized by Chapter 303 of the Texas Finance Code. Notwithstanding any provision to the contrary in this Note or in any other document, this loan is not secured by any collateral in addition to my homestead.

(emphasis added).

32.    In connection with obtaining the loan, Plaintiff was also provided with a document titled "Notice Concerning Extensions of Credit." (Ex. C.) This document sets forth various disclosures in connection with a loan which is made pursuant to Section 50(a)(6), Article XVI, Texas Constitution.

33.    All of the documents signed by Plaintiff in connection with his loan were drafted by BOA.

## C.  <u>DESPITE THE FACT THAT INSURANCE IS NOT REQUIRED UNDER THE TERMS OF PLAINTIFF'S LOAN, DEFENDANTS FORCE PLACED INSURANCE.</u>

34.    From approximately May 15, 2009 through May 15, 2010, Plaintiff maintained hazard insurance on his property with Allstate. During that period, Plaintiff paid approximately $800 in premiums in exchange for approximately $156,019 in coverage.

35.    Plaintiff's policy with Allstate lapsed on or about May 15, 2010.

36.    Defendants BOA and BAC sent Plaintiff a letter dated June 13, 2010. (Ex. D.) The letter is on Bank of America letterhead and is signed "Sincerely, Hazard/Flood Insurance Unit." The letter states that the recipient can write to "us" at an address for BAC Home Loans Servicing, LP located at a post office box in Forth Worth, Texas.

37.    The letter states "In order to protect the dwelling structure, BAC Home Loans requires that you maintain hazard insurance."

38.    The letter also indicated that if Plaintiff did not provide BAC with proof of insurance on his property, BAC "may have to purchase

-8-

insurance for [him.]"  The letter advised Plaintiff that the insurance would cost $2,501 and would be based on a coverage amount of $156,019.

39.   The letter further advised that the coverage BAC would purchase for Plaintiff would be "more expensive and will not protect [Plaintiff] as fully as a policy [he] could purchase."

40.   The letter explicitly informed Plaintiff that BAC's "licensed affiliated insurance agency may receive a commission for placing this insurance, which may be purchased from an affiliated insurer."

41.   The letter also included a list titled "BAC HOME LOANS HAZARD INSURANCE REQUIREMENTS."

42.   According to that list, Plaintiff was required to carry insurance in the lesser of:

- 100% of the insurable value of the improvements as established by the insurer or;
- The unpaid principal balance of the loan; or
- Notwithstanding the foregoing, if the unpaid principal balance is less than 80% of the insurable value of the improvements, the coverage amount must be at least 80% of the insurable value.

43.   The letter also stated "The name on the policy must be the same as the mortgagor/trustor/grantor of the security instrument or current owner in the case of an assumption."

44.   Defendants BOA and BAC sent Plaintiff a second letter dated July 12, 2010, (Ex. E), which stated "Your loan agreement requires that you have current evidence of insurance.  Please remit current evidence of hazard insurance."

45.   The letter continued, "If we do not receive your insurance the current deficient status of your loan will remain.  In addition you will be billed for any insurance purchased to protect our interest in the property.

1   This may be significantly more expensive and provide less coverage than
2   insurance you could obtain on your own."

3       46.    On July 21, 2010, Defendants BOA and BAC sent another letter.
4   (Ex. F.)   This letter informed Plaintiff that hazard insurance had been
5   purchased for his property.    The coverage amount was listed as being
6   $156,019 and the cost of the policy was represented as being $2,501.00.

7       47.    The declarations page accompanying this letter indicated that
8   the policy had been acquired from Defendant Balboa and backdated so that it
9   was effective as of May 16, 2010.

10      48.    Plaintiff subsequently acquired hazard insurance from Ranchers
11  and Farmers Mutual.  He purchased coverage in the amount of $243,000 and
12  was charged a premium of $608.  This policy became effective on October
13  21, 2010.

14      49.    Plaintiff contacted several insurers seeking a backdated policy
15  so he would not have to incur any of the exorbitant charges associated with
16  the backdated Balboa force-placed policy.  No insurers would sell him a
17  backdated policy.

18      50.    When Plaintiff provided Defendants BOA and BAC with notice
19  of his Ranchers and Farmers policy, Defendants BOA BAC and Balboa
20  cancelled the force-placed policy, and refunded him a portion of the
21  premium.   However, Plaintiff was charged $1,083 for the period of time
22  during which the backdated force place policy was in force.  Plaintiff paid
23  this amount.

24      51.    Plaintiff has made diligent efforts to obtain a copy of the actual
25  policy language for the policy that was force placed on him, but has been
26  unable to do so.

27      52.    Plaintiff called the phone number provided for "other inquiries"
28  on the Declaration page provided by Balboa (866-265-3321).    Plaintiff

CLASS ACTION COMPLAINT

1    provided the person who answered the phone with his "Policy Number."

2    The representative did not recognize the policy number as a valid number

3    and asked Plaintiff for his Bank of America loan number which Plaintiff

4    provided.   The representative was then able to find Plaintiff in his system.

5        53.    During this conversation, Plaintiff asked, "Is this Balboa

6    Insurance company I'm speaking with?"  In response, the representative told

7    Plaintiff that he was in fact speaking with Bank of America home loans.

8        54.    Plaintiff then requested a copy of the full policy for the Balboa

9    coverage which was in place from May 16, 2010 through October 21, 2010.

10   The representative refused to provide a copy of the policy.   Plaintiff was told

11   that the representative would only send him a copy of the Declaration page

12   and he would not send Plaintiff a copy of the full policy because BAC, not

13   Plaintiff, was the insured and the policy applied to numerous other

14   properties, not just Plaintiff's property.

15       55.    Plaintiff then called Balboa's claims phone number (1-800-323-

16   7466) and spoke with Balboa's representative.   Plaintiff again asked for a

17   copy of the "full policy" that had been in effect on his property, and for

18   which he had been charged.  He was told that Balboa does not have any

19   policy information and that he should call 866-265-3321, which was the

20   phone number for the Bank of America home loan office that he had

21   previously called.

22   **D.    DEFENDANTS BENEFITTED FINANCIALLY FROM THEIR**

23       **UNLAWFUL POLICIES.**

24       56.    BAC and Balboa shared responsibility for tracking hazard

25   insurance maintained by BOA mortgagors serviced by BAC.

26       57.    Balboa used a proprietary insurance tracking program referred

27   to as Tracksource/Rembrandt and/or Fidelity LPS to track records of hazard

28   insurance on the properties of BOA BAC serviced mortgagors.

CLASS ACTION COMPLAINT

58.     When Balboa discovered a lapse in hazard insurance, a cycle of letters was directed to the mortgagor.  Those cycle letters are form letters and are exemplified by the letters sent to Plaintiff and attached hereto.

59.     The letters in this cycle warned the recipient of the lapse in coverage and of the prospect of force-placed insurance.  Letters were sent automatically, without reference to the particular terms governing hazard insurance contained in any given mortgagor's loan.

60.     In the event the recipient of one of these cycle letters did not provide sufficient proof that the purportedly required insurance had been obtained, additional letters were sent requesting that the borrower do so.

61.     According to the schedule for sending the cycle letters, after a certain number of letters were sent, Balboa was authorized to force place a policy on the property and to charge BAC.

62.     BOA, BAC and Balboa had an arrangement whereby the hazard coverage Balboa provided for mortgagors serviced by BAC was provided under a single lender-placed insurance policy.  The terms of this coverage were the same for all BAC mortgagors who were covered by Balboa's lender-placed insurance policy in Texas.

63.     After this force placement occurred, another letter would be sent to the mortgagor informing the mortgagor of the force placed insurance, and its cost, and informing the mortgagor that the amounts listed as the premium were now due and owing.

64.     As described in the letters to Plaintiff, BOA and BAC's affiliate agent, BAISI, was paid a commission for policies that were force-placed pursuant to this contractual agreement, including Plaintiff's policy.

65.     Because the terms of the force-placed policy were negotiated in advance, and because the authority to place the insurance was delegated, BAISI provided no commensurate services for the commissions it received in

connection with the force-placement of Plaintiff's or other class members' insurance.

66.   BOA's practices with regard to force-placed insurance have attracted negative attention not just from homeowners, but also from analysts who follow the company's stock.  According to analysts, BOA's force-placed insurance practices are not just bad for borrowers, they are also bad for investors.

67.   For example, at a mortgage-backed securities conference last year, analyst Laurie Goodman of Amherst Securities criticized Bank of America's higher than market rate of force placed insurance, accusing BAC of hurting investors by stalling foreclosures in order to allow Balboa to rack up profits for its above market priced forced-place insurance.

68.   The troubling alliances between lenders, loan servicers and force-placed insurers have also recently attracted attention in banking circles, including an exposé in American Banker magazine from November of 2010 which spotlighted Bank of America's relationship with Balboa, titled "Ties to Insurers Could Land Mortgage Servicers in More Trouble."  (Ex. G.)

69.   In that article, the spokesman for the Department of Housing and Urban Development is quoted as opining that practices like the one at issue here violate federal law.  "It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed."  (See id.)

70.   After publication, this exposé received the Society of American Business Editors and Writers award for "best investigative" writing for publications with a circulation of below 25,000.

71.   The National Association of Insurance Commissioners has indicated that insurance is "prospective in nature."  Insurance policies like the ones at issue here should not be backdated.

72.     The Texas Department of Insurance does not regulate insurers' rates for force-placed hazard insurance.  Force-placed insurance is treated as a separate, unregulated, category of insurance by the Texas Department of Insurance.

## <u>CLASS ACTION ALLEGATIONS</u>

73.     Plaintiff also asserts his Breach of Contract claim in Count One and his Fraud claim in Count Three on behalf of a Putative Texas Class defined as follows:

**Proposed Texas Class:**

All persons who:

(1) have or have had a loan or line of credit with Defendants BOA and BAC that was made pursuant to Section 50(a)(6), Article XVI, Texas Constitution; and

(2) who were required by Defendants to purchase hazard insurance within the applicable statute of limitations.

74.     Plaintiff asserts his Breach of Contract claim in Count Two and his Unjust Enrichment claim in Count Four on behalf of a Putative Nationwide Class defined as follows:

**Proposed Nationwide Class:**

All persons who have or had a loan or line of credit with BOA secured by their residential property, and on whom hazard insurance was force-placed within the applicable statute of limitations.

75.     <u>Numerosity</u>:     The Putative Classes are so numerous that joinder of all class members is impracticable.  Plaintiff is informed and believes that during the relevant time period, hundreds, if not thousands, of Defendants' customers satisfy the definition of the Putative Classes.

-14-

76. <u>Typicality</u>:      Plaintiff's claims are typical of the members of the Putative Classes.  Plaintiff is informed and believes that his loan and mortgage documents are typical of those of other Putative Class members, that the hazard insurance notices he received were typical of those received by other Putative Class members, that Defendants treated him consistent with other Putative Class members in accordance with Defendants' standard policies and practices, that it was typical for Defendants to require their customers to purchase and maintain hazard insurance in an amount greater than that required by their Texas mortgage documents, under fraudulent pretenses, and that it was typical for Defendants to backdate policies, charge exorbitant premiums and pay themselves and their affiliates kickbacks and commissions in conjunction with force- placed insurance.

77. <u>Adequacy</u>:      Plaintiff will fairly and adequately protect the interests of the Putative Classes, and has retained counsel experienced in complex class action litigation.   There are no known conflicts between Plaintiff and the members of the class he seeks to represent.

78. <u>Commonality</u>:    Common questions of law and fact exist as to all members of the Putative Classes and predominate over any questions solely affecting individual members of the Putative Classes, including but not limited to:

> a.      Whether Defendants BOA and BAC breached their Texas Homestead Lien Contracts by force placing insurance when no insurance was required by the contracts;

> b.      Whether Defendants BOA and BAC have a pervasive policy and practice of misrepresenting to their customers that their mortgage agreements require hazard insurance when in fact they do not;

> c.      Whether Defendants BOA and BAC breached their

-15-

contracts with borrowers by backdating force placed insurance and dealing only with affiliated businesses who charged exorbitant premiums and were paid unearned kickbacks;

d.     Whether Defendants BOA and BAC's standard hazard insurance notice letters are false, deceptive, misleading and/or fraudulent;

e.     Whether Defendants BOA BAC BAISI and Balboa were unjustly enriched by the activities described herein;

f.     The appropriateness and form of any equitable relief reversing charges for hazard insurance coverage, allowing customers to close loans or credit lines without first paying premiums for hazard insurance that were not necessary, ordering Defendants to cease and desist from such conduct in the future, or any other declaratory or injunctive relief.;

g.     The appropriateness and proper measure of monetary and other damages sustained by the Putative Classes; and

h.     The appropriateness and proper measure of any penalties, fines, or other remedies available to the Putative Classes.

79.     This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Putative Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

80.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Putative Classes

CLASS ACTION COMPLAINT

predominate over any questions affecting only individual members of the Putative Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct described in this Complaint stems from common and uniform policies and practices, resulting in unnecessary insurance premiums and related charges that are readily calculable from Defendants' records and other class-wide evidence.   Members of the Putative Classes do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any members of the Putative Classes. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Putative Class members' claims in a single forum in Texas, where nearly all of the Putative Texas Class members reside and many of the Putative Nationwide Class members reside.

81.    Plaintiff intends to send notice to all members of the Putative Classes to the extent required by Rule 23.  The names and addresses of the Putative Class members are available from Defendants' records.

## COUNT ONE

### BREACH OF CONTRACT

**Asserted on Behalf of Plaintiff and the Texas Class**

**Against BAC and BOA**

82.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

83.     Plaintiff's Homestead Lien Contract does not require hazard insurance.

84.     Defendants BAC and BOA breached the Homestead Lien Contract by requiring Plaintiff to obtain hazard insurance.

85.     This breach was willful and not the result of mistake or inadvertence.  Defendants BOA and BAC systematically and pervasively required other members of the Putative Texas Class to obtain hazard insurance in spite of explicit contractual language to the contrary.

86.     As a direct result of Defendants' unlawful conduct, Plaintiff and the Putative Texas Class have suffered damages in the form of insurance premiums, escrow charges, interest payments, and/or other charges, and unnecessary burdens on their property rights.

87.     Plaintiff and the Putative Texas Class are entitled to recover their damages and other appropriate relief for the foregoing contractual breaches.

## COUNT TWO

### BREACH OF CONTRACT

**Asserted on Behalf of Plaintiff and the Nationwide Class**

**Against BAC and BOA**

88.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

89.     Backdating hazard insurance was not necessary or appropriate to protect BOA's interest as lender.  Nor was it allowed by the explicit terms of the Homestead Lien Contract.

90.     Defendants breached the Homestead Lien Contract by force-placing backdated insurance.

91.     To the extent any insurance could be force-placed without breaching the contract, Plaintiff's Homestead Lien Contract only allows

-18-

1   Defendants BOA and BAC to pass along the "expenses" incurred in securing

2   such insurance.  The "expenses" contemplated by the contract include neither

3   exorbitant hazard premiums nor commissions paid to Defendants' affiliates.

4   The contract is not a blank check.

5       92.    Defendants' breach was willful and not the result of mistake or

6   inadvertence.   Defendants systematically and pervasively required other

7   members of the Nationwide Class to obtain excessive and overpriced hazard

8   insurance in spite of explicit contractual language to the contrary.

9       93.    As a direct result of Defendants' unlawful conduct, Plaintiff and

10  the Nationwide Class have suffered damages in the form of insurance

11  premiums, escrow charges, interest payments, and/or other charges, and

12  unnecessary burdens on their property rights.

13      94.    Plaintiff and the Nationwide Class are entitled to recover their

14  damages and other appropriate relief for the foregoing contractual breaches.

15  ## COUNT THREE

16  ## COMMON LAW FRAUD

17  **Asserted on Behalf of Plaintiff and the Texas Class**

18  **Against BAC and BOA**

19      95.    Plaintiff alleges and incorporates by reference the allegations in

20  the preceding paragraphs.

21      96.    Defendants BOA and BAC falsely represented to Plaintiff and

22  other Putative Texas Class members that their hazard insurance coverage was

23  not sufficient under their mortgage agreements when in fact no hazard

24  insurance was required by their mortgage agreements.

25      97.    These representations were material.

26      98.    Defendants BOA and BAC knew that they had no reasonable

27  basis for making these representations, and knew that such representations

28  were not supported by their mortgage agreements, or business necessity.

1    These representations were made recklessly as a positive assertion without

2    any knowledge of their truth.

3          99.    Defendants intended to induce Plaintiff and class members to act

4    upon the representations.

5          100.   These representations were made for the purpose of (i) unfairly

6    and unconscionably maximizing revenue from such customers; (ii)

7    generating interest, fees, commissions, and "other compensation" for BOA

8    and its affiliates; (iii) providing a ready-made customer base for Balboa and

9    BAISI; (iv) gaining unwarranted contractual and legal advantages; and (v)

10   depriving Plaintiff and other Putative Texas Class members of their

11   contractual and legal rights to obtain a loan, extension of credit, or credit

12   renewal (or maintain the same) without having to purchase hazard insurance.

13         101.   Plaintiff and other members of the Texas Class reasonably and

14   justifiably relied on Defendants' intentional misrepresentations, and based on

15   those misrepresentations, paid for insurance coverage that was not required

16   under their mortgage agreements.

17         102.   As a direct result of Defendants' intentional misrepresentations,

18   Plaintiff and the Texas Class have suffered damages in the form of increased

19   insurance premiums, escrow charges, interest payments, and/or other

20   charges, and unnecessary burdens on their property rights.  Plaintiff and the

21   Texas Class are entitled to recover these damages and other appropriate relief

22   from Defendants.

### COUNT FOUR

### UNJUST ENRICHMENT

**Asserted on Behalf of Plaintiff and the Nationwide Class**

**Against BOA, BAC, BAISI and BALBOA**

27         103.   Plaintiff alleges and incorporates by reference the allegations in

28   the preceding paragraphs.

-20-

104. By placing exorbitantly priced force placed insurance on borrowers, through the use of their affiliated insurer Balboa, BOA and BAC were able to place additional fees and costs on loans, including but not limited to premium costs, interest and escrow fees associated with the additional charge amounts. BOA and BAC were unjustly enriched by this practice.

105. By, among other things, charging exorbitant rates for lender-placed hazard insurance, backdating its policies while still charging full value premiums, and by taking advantage of its position as an affiliate of BOA and BAC, Balboa was unjustly enriched by the premiums it collected.

106. By receiving commissions in exchange for performing no commensurate services, and by taking advantage of its position as an affiliate of BOA, BAC and Balboa, Defendant BAISI was unjustly enriched by the commissions it accepted.

107. Plaintiff and members of the Nationwide Class were injured by this unjust enrichment and are entitled to recover damages and other appropriate relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Putative Classes, prays for relief as follows:

A.    Determining that this action may proceed as a class action under Rule 23(b) (2) and (3) of the Federal Rules of Civil Procedure;

B.    Designating Plaintiff as representative of the Putative Classes;

C.    Designating Plaintiff's counsel as counsel for the Putative Classes;

D.    Issuing proper notice to the Putative Classes at

Defendants' expense;

E.    Declaring that Defendant BAC and BOA's conduct was fraudulent, and violated the terms of their contracts;

F.    Declaring  that Defendant BOA, BAC BAISI and Balboa's conduct resulted in their unjust enrichment;

G.    Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Putative Classes;

H.    Awarding appropriate equitable relief, including but not limited to restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans or credit lines without first paying premiums for hazard insurance that were not necessary or required by law, and to cease and desist from engaging in further unlawful conduct in the future;

I.    Awarding actual damages, statutory damages, treble damages, punitive damages, penalties, and interest;

J.    Awarding reasonable attorneys' fees and costs; and

K.    Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Putative Class demand a trial by jury.

Respectfully submitted,

1

Dated:   05/13/11

NICHOLS KASTER, PLLP

2

3

By: _____

4

Rebekah L. Bailey

5

6

NICHOLS KASTER, LLP

7

8

ATTORNEYS FOR INDIVIDUAL

9

AND REPRESENTATIVE

10

PLAINTIFF

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-23-

CLASS ACTION COMPLAINT

# EXHIBIT A

**WHEN RECORDED MAIL TO:**
Bank of America Consumer Collateral Tracking, FL9-700-04-12
9000 Southside Blvd, Bldg 700
Jacksonville, FL 32256

---

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
**THE EXTENSION OF CREDIT EVIDENCED BY THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST IS THE TYPE OF CREDIT DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION.**

**THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST** dated January 17, 2008, is made and executed between KENT FARMER AKA KENT R FARMER, AN UNMARRIED PERSON (referred to below as "Owner") and Bank of America, N.A., whose address is 901 Main St., 67th Floor, Dallas, TX 75202 (referred to below as "Lender").

**GRANT OF LIEN.** For valuable consideration, Owner grants a lien under Section 50(a)(6), Article XVI, Texas Constitution in and to the following described real property, together with all improvements, all proceeds (including without limitation premium refunds) of each policy of insurance relating to any of the Improvements, or the Real Property; and all easements, rights of way, and appurtenances; all water and water rights; and all other rights, royalties, and profits relating to (the "Real Property") located in BEXAR County, State of Texas:

See Exhibit A, which is attached to this Homestead Lien Contract and made a part of this Homestead Lien Contract as if fully set forth herein.

**The Real Property** or its address is commonly known as 10507 RAFTER S-TRL, HELOTES, TX 78023-3819. The Real Property tax identification number is 045250140530.

Owner conveys the Real Property to Trustee in trust for the benefit of Lender as hereinafter set forth.

**THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST. THIS HOMESTEAD LIEN CONTRACT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**HOMESTEAD PROPERTY.** Owner represents to Lender that the Property is Owner's homestead. If a part of the Property is not now, or at any time in the future is determined not to be, Owner's homestead, Lender hereby disclaims any lien on such non-homestead property, it being Lender's intention to obtain a lien, as provided for by Section 50(a) (6), Article XVI, Texas Constitution, in Owner's homestead property only. If the Property, as a whole, is determined not to be Owner's homestead, this lien shall be governed by other applicable Texas law.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Homestead Lien Contract, Owner shall pay to Lender all amounts secured by this Homestead Lien Contract as they become due and shall strictly perform all of Owner's obligations under this Homestead Lien Contract.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Owner agrees that Owner's possession and use of the Property shall be governed by the following provisions:

**Duty to Maintain.** Owner shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Nuisance, Waste.** Owner shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Owner will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent. This restriction will not apply to rights and easements (such as gas and oil) not owned by Owner and of which Owner has informed Lender in writing prior to Owner's signing of this Homestead Lien Contract.

**Removal of Improvements.** Owner shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Owner to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Owner's compliance with the terms and conditions of this Homestead

# HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
## (Continued)

Loan No: 7026218730

Page 2

Lien Contract.

**Compliance with Governmental Requirements.** Owner shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Owner may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Owner has notified Lender in writing prior to doing so and as long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Owner to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Owner agrees neither to abandon or leave unattended the Property. Owner shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Homestead Lien Contract upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Texas law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Homestead Lien Contract:

**Payment.** Owner shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Owner shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Homestead Lien Contract, except for the lien of taxes and assessments not due and except as otherwise provided in this Homestead Lien Contract.

**Right to Contest.** Owner may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Owner shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Owner has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and Lender's reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Owner shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Owner shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Owner shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Owner shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Owner will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Owner can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Homestead Lien Contract:

**Maintenance of Insurance.** Owner at Lender's request shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Owner shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Owner or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Owner agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Owner shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Owner fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Owner shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Owner from the proceeds for the reasonable cost of repair or restoration if Owner is not in default under this Homestead Lien Contract. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Homestead Lien Contract, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Owner as Owner's interests may appear.

**LENDER'S EXPENDITURES.** If Owner fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, or (C) to make repairs to the Property then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Owner's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. To the extent permitted by applicable law, all expenses paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Owner. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will be payable on demand. The Homestead Lien Contract also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition

## HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
### (Continued)

Loan No: 7026218730

Page 3

to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Homestead Lien Contract:

**Title.** Owner warrants that: (a) Owner holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Homestead Lien Contract, and (b) Owner has the full right, power, and authority to execute and deliver this Homestead Lien Contract to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Owner warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Owner's title or the interest of Lender under this Homestead Lien Contract, Owner shall defend the action at Owner's expense. Owner may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Owner will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Owner warrants that the Property and Owner's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**CONDEMNATION, JUDGMENTS AND AWARDS.** The following provisions relating to condemnation proceedings, judgments, decrees and awards for injury to the Property are a part of this Homestead Lien Contract:

**Application of Net Proceeds.** To the extent permitted by applicable law, all judgments, decrees and awards for injury or damage to the Property, or any part of the Property, and awards pursuant to proceedings for condemnation of the Property, are hereby absolutely assigned to Lender, and if all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the indebtedness or the repair or restoration of the Property. The net proceeds of the award, judgment or decree shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**Proceedings.** If any proceeding in condemnation is filed, Owner shall promptly notify Lender in writing, and Owner shall promptly take such steps as may be necessary to defend the action and obtain the award. Owner may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Owner will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Homestead Lien Contract:

**Current Taxes, Fees and Charges.** Upon request by Lender, Owner shall execute such documents in addition to this Homestead Lien Contract and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. To the extent permitted by applicable law, Owner shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Homestead Lien Contract, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Homestead Lien Contract.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Homestead Lien Contract or upon all or any part of the Indebtedness secured by this Homestead Lien Contract; (2) a specific tax on Owner which Owner is authorized or required to deduct from payments on the Indebtedness secured by this type of Homestead Lien Contract; (3) a tax on this type of Homestead Lien Contract chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Owner.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Homestead Lien Contract, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Owner either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Homestead Lien Contract:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Owner will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Owner's obligations under the Note, this Homestead Lien Contract, and the Related Documents, and (2) the liens and security interests created by this Homestead Lien Contract as first and prior liens on the Property, whether now owned or hereafter acquired by Owner. Unless prohibited by law or Lender agrees to the contrary in writing, Owner shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** To the extent permitted by applicable law, if Owner fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Owner and at Owner's expense. For such purposes, Owner hereby irrevocably appoints Lender as Owner's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Owner pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Owner under this Homestead Lien Contract, Lender shall execute and deliver to Owner a suitable satisfaction of this Homestead Lien Contract. Owner will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**DEFAULT.** At Lender's option, Owner will be in default under this Homestead Lien Contract if any of the following happen:

**Payment Default.** Owner fails to make any payment when due under the Indebtedness.

## HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
### (Continued)

Loan No: 7026218730

Page 4

**Default on Other Payments.** Failure of Owner within the time required by this Homestead Lien Contract to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Break Other Promises.** Owner fails to timely and strictly perform all promises made to Lender contained in this Homestead Lien Contract or in an agreement related to this Homestead Lien Contract.

**False Statements.** Any representation or statement made or furnished to Lender by Owner or on Owner's behalf under this Homestead Lien Contract or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished.

**Defective Collateralization.** This Homestead Lien Contract or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected lien) at any time and for any reason.

**Death or Insolvency.** The death of Owner, the insolvency of Owner, the appointment of a receiver for any part of Owner's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Owner.

**Taking of the Property.** Any creditor or governmental agency tries to take any of the Property. However, if Owner disputes in good faith whether the claim on which the taking of the Property is based is valid or reasonable, and if Owner gives Lender written notice of the claim and furnishes Lender with monies or a surety bond satisfactory to Lender to satisfy the claim, then this default provision will not apply.

**Right to Cure.** If such a failure is curable, it may be cured if Owner, after Lender sends written notice demanding cure of such failure: (a) cures the failure within twenty (20) days; or (b) if the cure requires more than twenty (20) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** After giving any required notice of default and after Owner's failure to cure the default during any required cure period, Lender may declare due the entire Indebtedness.

**Foreclosure By Court Order Only.** If Lender forecloses upon the lien granted in this Homestead Lien Contract, Lender will comply with the applicable rules of civil procedure promulgated by the Texas Supreme Court for expedited foreclosure proceedings as those rules may change from time to time, or Lender may exercise such other remedy as may be available to Lender for loans made pursuant to the authority of Section 50(a)(6), Article XVI of the Texas Constitution. When Lender has complied with the appropriate procedures to obtain permission to foreclose pursuant to Section 51.002 of the Texas Property Code, as it may be amended from time to time, Lender may request the Trustee to foreclose by power of sale and the Trustee shall do so consistently with the rules of civil procedure and Section 51.002 of the Texas Property Code. The Trustee shall have all the powers granted to a trustee under the terms of Section 51.002 of the Texas Property Code and all amendments thereto and all other rights and remedies that are now available to or may hereafter be granted to Trustee to the extent such rights and remedies are consistent with loans made pursuant to the authority of Section 50(a)(6), Article XVI of the Texas Constitution. Lender may appoint in writing a substitute or successor Trustee, succeeding to all rights and responsibilities of Trustee. If an Event of Default occurs, and after court order, Trustee is requested by Lender to foreclose this lien, the Trustee shall (1) convey all or part of the Property to the highest bidder for cash with a general warranty deed binding Owner, subject to prior liens and to other exception to conveyance and warranty, and (3) from the proceeds of the sale, pay in order: (a) expenses of foreclosure; (b) to Lender the full amount of principal, interest and other permitted charges; (c) any amounts required by law to be paid before payments to Owner; and (d) to Owner any balance.

**No Deficiency Judgment.** Lender shall not obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Rights and Remedies on Default section unless the Indebtedness was obtained by Owner by actual fraud.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Homestead Lien Contract or the Note or available at law or in equity.

**Cure Notice.** Owner acknowledges and agrees that Article XVI, Section 50(a)(6)(Q)(x) of the Texas Constitution provides Lender and any holder of this Homestead Lien Contract with the right to correct a failure to comply with Lender's or holder's obligations under the extension of credit. A notice of non-compliance with applicable law to Lender or the holder of this Homestead Lien Contract may be in writing and mailed to:

Bank of America, N.A.
Attn: Portfolio Administration
P.O. Box 26865
Richmond, VA 23261-9914

or to an address if Owner is given notice pursuant to this Homestead Lien Contract of that different address.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Owner's obligations under this Homestead Lien Contract, after Owner's failure to do so, that decision by Lender will not affect Lender's right to declare Owner in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Homestead Lien Contract, Lender shall be entitled to recover such sum as the court may adjudge reasonable as Lender's attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Owner also will pay any court costs, in addition to all other sums provided by law. In the event of foreclosure

## HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
(Continued)

of this Homestead Lien Contract, Lender shall be entitled to recover from Owner Lender's reasonable attorneys' fees and actual disbursements that Lender necessarily incurs in pursuing such foreclosure.

**NOTICES.** Any other notice required to be given under this Homestead Lien Contract shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Homestead Lien Contract. Any person may change his or her address for notices under this Homestead Lien Contract by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Owner agrees to keep Lender informed at all times of Owner's current address. Unless otherwise provided or required by law, if there is more than one Owner, any notice given by Lender to any Owner is deemed to be notice given to all Owners. It will be Owner's responsibility to tell the others of the notice from Lender.

**INSURANCE.** Notwithstanding any language to the contrary in this Homestead Lien Contract or in any Related Document, if this Homestead Lien Contract secures an extension of credit pursuant to Section 50(a)(6), Article XVI, Texas Constitution, Lender does not require fire insurance with standard extended coverage endorsements on the property. However, if as of the date of this Homestead Lien Contract, Owner has in force such insurance on the Property, then all such policies covering loss or damage to the Property shall include a standard non contributory mortgagee clause in favor of Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Homestead Lien Contract:

**Amendments.** What is written in this Homestead Lien Contract and in the Related Documents is Owner's entire agreement with Lender concerning the matters covered by this Homestead Lien Contract. To be effective, any change or amendment to this Homestead Lien Contract must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Governing Law.** This Homestead Lien Contract will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Homestead Lien Contract has been accepted by Lender in the State of Texas.

**Caption Headings.** Caption headings in this Homestead Lien Contract are for convenience purposes only and are not to be used to interpret or define the provisions of this Homestead Lien Contract.

**Merger.** There shall be no merger of the interest or estate created by this Homestead Lien Contract with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**No Waiver by Lender.** Owner understands Lender will not give up any of Lender's rights under this Homestead Lien Contract unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Owner will not have to comply with the other provisions of this Homestead Lien Contract. Owner also understands that if Lender does consent to a request, that does not mean that Owner will not have to get Lender's consent again if the situation happens again. Owner further understands that just because Lender consents to one or more of Owner's requests, that does not mean Lender will be required to consent to any of Owner's future requests. Owner waives presentment, demand for payment, protest, notice of dishonor, notice of intent to accelerate, and notice of acceleration.

**Savings Clause.** It is agreed that notwithstanding any provision of this Homestead Lien Contract to the contrary, in no event shall this Homestead Lien Contract require or permit any action which would be prohibited by Section 50(a)(6), Art. XVI, Texas Constitution, and all provisions of this Homestead Lien Contract shall be modified to comply fully with Section 50(a)(6), Art. XVI, Texas Constitution. In particular, this section means (among other things), that Owner does not agree or intend to pay, and Lender does not agree or intend to contract for, charge or collect, any amount in the nature of a fee or charge for the Indebtedness which would in any way or event cause Lender to charge or collect more for extension of credit than the maximum Lender would be permitted to charge or collect by the laws of the State of Texas.

**Severability.** If a court finds that any provision of this Homestead Lien Contract is not valid or should not be enforced, that fact by itself will not mean that the rest of this Homestead Lien Contract will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Homestead Lien Contract even if a provision of this Homestead Lien Contract may be found to be invalid or unenforceable.

**Successors and Assigns.** Subject to any limitations stated in this Homestead Lien Contract on transfer of Owner's interest, this Homestead Lien Contract shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Owner, Lender, without notice to Owner, may deal with Owner's successors with reference to this Homestead Lien Contract and the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Homestead Lien Contract.

**Waive Jury.** All parties to this Homestead Lien Contract hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following words shall have the following meanings when used in this Homestead Lien Contract:

**Borrower.** The word "Borrower" means KENT FARMER.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Homestead Lien Contract in the default section of this Homestead Lien Contract.

**Homestead Lien Contract.** The words "Homestead Lien Contract" mean this Homestead Lien Contract and Deed of Trust between Owner and Lender.

**Improvements.** The word "Improvements" means all existing and future improvements, fixtures, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Owner's obligations or expenses incurred by Lender to enforce Owner's obligations under this Homestead Lien Contract, together with interest on such amounts as provided in this Homestead Lien Contract.

## HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
(Continued)

Loan No: 7026218730

Page 6

**Lender.** The word "Lender" means Bank of America, N.A., its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Note.

**Note.** The word "Note" means the note or credit agreement dated January 17, 2008, in the principal amount of $117,608.99 from KENT FARMER to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the note or credit agreement.

**Owner.** The word "Owner" means KENT FARMER. The words "Owner" and "Borrower" are used interchangeably.

**Property.** The word "Property" means collectively the Real Property and the Improvements. Notwithstanding language in any other agreement with Lender by Owner, the Indebtedness is secured by the Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Homestead Lien Contract.

**Related Documents.** The words "Related Documents" mean all promissory notes, loan agreements, environmental agreements, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Trustee.** The word "Trustee" means PRLAP, INC., whose address is 901 MAIN ST., DALLAS, TX 75202-3714, and any substitute or successor trustees.

OWNER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS HOMESTEAD LIEN CONTRACT, AND OWNER AGREES TO ITS TERMS. OWNER ACKNOWLEDGES THAT ALL BLANKS WERE FILLED IN PRIOR TO OWNER SIGNING THIS HOMESTEAD LIEN CONTRACT. OWNER FURTHER ACKNOWLEDGES THAT OWNER RECEIVED A COPY OF THE DISCLOSURES REQUIRED BY SECTION 50(g), ARTICLE XVI, TEXAS CONSTITUTION, AT LEAST 12 DAYS PRIOR TO THE DATE OF THIS HOMESTEAD LIEN CONTRACT.

OWNER:

X_____
   KENT FARMER

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _____   )
                                           ) SS
COUNTY OF _____   )

This instrument was acknowledged before me on _____, 20_____ by KENT FARMER.

_____
Notary Public, State of Texas

LASER PRO Lending, Ver. 6.38.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. · TX C:\CFI\CFILPL\G06.FC TR-23691653 PR-TXHELOAN

# EXHIBIT B

# PROMISSORY NOTE

**ACCOUNT NUMBER  7026218730**

| | |
|---|---|
| **Borrower:** KENT FARMER<br>10507 RAFTER S TRL<br>HELOTES, TX 78023-3819 | **Lender:** Bank of America, N.A.<br>c/o Texas Main Office<br>901 Main St.<br>67th Floor<br>Dallas, TX 75202 |

---

**Principal Amount:  $117,608.99**   **Interest Rate:  6.000%**   **Date of Note:  January 17, 2008**

**PROMISE TO PAY.**  I ("Borrower") promise to pay to Bank of America, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Hundred Seventeen Thousand Six Hundred Eight & 99/100 Dollars ($117,608.99), together with interest at the rate of 6.000% per annum on the unpaid principal balance from January 23, 2008, until maturity. The interest rate may change under the terms and conditions of the "POST MATURITY RATE" section.

**PAYMENT.**  I will pay this loan in 299 payments of $757.89 each payment and an irregular last payment estimated at $757.42. My first payment is due February 22, 2008, and all subsequent payments are due on the same day of each month after that. My final payment will be due on January 22, 2033, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to : first, all interest due and owing on the date payment is credited, then to principal, then to fees or charges due under this Note, including any unpaid collection costs and late charges. Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the annual interest rate over the number of days in a year, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. I will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**PREPAYMENT.**  I may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will relieve me of my obligation to continue to make payments under the payment schedule and will be applied to the next - due payment(s). If a prepayment is insufficient to meet the entire requirements of a particular future installment then I shall be obligated to pay such portion of the installment not covered by the partial prepayment. My obligation to continue to make regular payments under the payment schedule will resume with the next payment coming due after all early payments have been applied. Early payments will reduce the principal balance due and may result in my making fewer payments. I agree not to send Lender payments marked "paid in full", "without recourse" or similar language. If I send such a payment, Lender may accept it without losing any of Lender's rights under this Note, and I will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any checks or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to Lender at the address shown on my coupon book or statement.

**FEES LIMITED.**  Notwithstanding any provision to the contrary in this Note or any contract related to this Note, I do not agree or intend to pay, and Lender does not agree or intend to charge or collect, any fee or charge that would in any way cause Lender to charge or collect more than the maximum Lender would be permitted to charge under Section 50(a)(6), Article XVI, Texas Constitution.

**POST MATURITY RATE.**  I will continue to pay interest on all sums due after final maturity, whether by acceleration or otherwise, at the note rate in effect at the time of the final maturity.

**DEFAULT.**  I will be in default under this Note if any of the following happen:

**Payment Default.**  I fail to make any payment when due under this Note.

**Break Other Promises.**  I fail to timely and strictly perform all promises made to Lender contained in this Note or in an agreement related to this Note.

**False Statements.**  Any representation or statement made or furnished to Lender by me or on my behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished.

**Death or Insolvency.**  Any Borrower dies or becomes insolvent; a receiver is appointed for any part of my property; I make an assignment for the benefit of creditors; or any proceeding is commenced either by me or against me under any bankruptcy or insolvency laws.

**Taking of the Property.**  Any creditor or governmental agency tries to take any of the property. However, if I dispute in good faith whether the claim on which the taking of the property is based is valid or reasonable, and if I give Lender written notice of the claim and furnish Lender with monies or a surety bond satisfactory to Lender to satisfy the claim, then this default provision will not apply.

**Defective Collateralization.**  This Note or any of the related documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected lien) at any time and for any reason.

**Collateral Damage or Loss.**  Any collateral securing this Note is lost, stolen, substantially damaged or destroyed and the loss, theft, substantial damage or destruction is not covered by insurance.

**Cure Provisions.**  If any default, other than a default in payment is curable, it may be cured if I, after receiving written notice from Lender demanding cure of such default: (1) cure the default within twenty (20) days; or (2) if the cure requires more than twenty (20) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.**  Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which I am responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then I will pay that amount. Upon default, after giving any required notice of default and after my failure to cure the default during any required cure period, Lender may declare due the entire indebtedness, including the unpaid principal balance, accrued unpaid interest, and all other amounts, costs and expenses for which I am responsible under this Note or any other agreement with Lender pertaining to this loan and I will then pay that amount. Lender's remedies in the event this Note is not paid at maturity, however that maturity happens, is to look exclusively to the collateral for this Note, and no deficiency or monetary judgment, execution, attachment or other writ or process shall be sought, issued, or levied upon or against me or upon any assets, properties or funds other than the collateral described in this Note, unless the advance evidenced by this Note is obtained by actual fraud on my part.

**ATTORNEYS' FEES; EXPENSES.**  Lender may hire an attorney to help collect this Note if I do not pay, and I will pay Lender's reasonable attorneys' fees. I also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**JURY WAIVER.**  Lender and I hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or me

**PROMISSORY NOTE**
**(Continued)**

Loan No: 7026218730

against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

**DISHONORED CHECK CHARGE.** I will pay a processing fee of $15.00 if any check given by me to Lender as a payment on this loan is dishonored.

**COLLATERAL.** I acknowledge this Note is secured by the following collateral described in the security instrument listed herein: a Homestead Lien Contract and Deed of Trust dated January 17, 2008, to a trustee in favor of Lender on real property located in BEXAR County, State of Texas.

**HOME EQUITY LOAN.** THIS LOAN IS AN EXTENSION OF CREDIT OF THE TYPE DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION and is made at an agreed rate authorized by Chapter 303 of the Texas Finance Code. Notwithstanding any provision to the contrary in this Note or in any other document, this loan is not secured by any collateral in addition to my homestead.

**ADDITIONAL GENERAL PROVISIONS.** We reserve the right to waive or reduce any or all fees from time to time in our sole discretion without notice. Unless required by law, we need not pay any refund if the amount is less than one dollar ($1.00). Acceptance of partial payments or partial performance shall not operate as a waiver of any requirement under this Note. Any notice from us shall be deemed to be reasonable if mailed to your address at least five (5) calendar days before the time of the event to which such notice relates. It is your sole and exclusive responsibility to determine any and all aspects of federal, state and local tax law regarding the deduction of interest and costs on this Note. You should consult a tax advisor regarding the deductibility of interest and costs incurred under this Note. We have not provided and do not provide tax advice of any kind. At any time, we may assign or transfer this Note to another person or entity and the assignee will have all of our rights under this Note. You cannot assign or transfer any of your rights or responsibilities under this Note.

**MISCELLANEOUS.** If this Note or Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation. You agree that if this Note or Agreement is in default, including the failure to make the Minimum Payment by the due date, you will accept calls regarding the collection of this Note or Agreement at any residence or place of employment. The calls can be automatically dialed and a recorded message may be played. You agree such calls will not be "unsolicited" calls for purposes of any federal, state or local law. To improve customer service and security, telephone communications with you may be monitored and recorded. You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed. You authorize us, our parent company, Bank of America Corporation (or any successor company) and Bank of America Corporation's affiliates and subsidiaries to: (a) obtain other information deemed necessary concerning the granting and maintaining of this Note or Credit Line Account, including the obtaining of credit bureau and other reports concerning your credit experience and other information from credit reporting agencies, creditors, any department of motor vehicles or similar state agency, your employer (past, present and future) and other persons (and all such entities may release and/or verify such information to us at any time without notification to you or without your consent), (b) release Note or Credit Line Account information to comply with any served subpoena, summons or order issued by any state or federal agency or court, and (c) provide application, Note and Credit Line Account information to any third party who is reasonably believed to be conducting an inquiry according to the Federal Fair Credit Reporting Act or any similar state law. This Note or Agreement constitutes the entire understanding and agreement between the parties as to the matters set forth in this Note or Agreement and supercedes all prior understandings and correspondence, oral or written, with respect to the subject matter hereof. We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for any such deferment or delay. A court decree for divorce or separation or a non-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Note or Credit Line balance if we are not a party to the decree or agreement. Notwithstanding any other provision contained in the Note or this Agreement, we do not intend to charge, and you shall not be required to pay, any amount of finance charge or fee more than the maximum permitted by applicable law. Any payment in excess of the maximum shall be refunded to you or credited against principal, at our option. If this Note or CreditLine Agreement is a renewal of a prior Note or CreditLine Agreement, then it is the intent of the parties that the Note or CreditLine Agreement evidencing the original extension of credit not be extinguished by the renewal. It is further the intent of the parties that no novation shall occur by the renewal of such extension of credit. Our records shall be evidence of whether this Note or CreditLine Agreement is a renewal.

**AUTOMATIC PAYMENT AND RESERVATION OF RIGHTS.** If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

**PAYMENT INFORMATION.** If you make a payment(s) before or after the due date, the amount of your final payment may be higher or lower than the original scheduled amount. We may accept late payments or partial payments, even though marked "Payment in Full" (or a similar notation). We may accept payments accompanied by a letter stating that acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under this Note. You will make all payments by check or money order, payable to us, drawn in U.S. dollars and payable through a U.S. financial institution or the U.S. Post Office. We will credit payments to this Note on the business day received if received before 2:00 P.M. at the location we specify or at one of our banking centers in the state of our address first described above. Otherwise, payments may not be credited to your loan for up to five (5) business days, even if payment is received under our arrangement with an affiliated bank to accept payments from our customers or at one of our ATMs. A business day is any day Monday through Friday that is not a legal holiday. Unless otherwise required by applicable law, to determine whether a late charge is due, we will apply any payment received to the oldest payment due.

**CURE NOTICE.** A notice of non-compliance with applicable law to Lender or the holder of this Note may be in writing and mailed to:

Bank of America, N.A.
Attn: Portfolio Administration
P.O. Box 26665
Richmond, VA  23261-9914

or to a different address if I am given notice pursuant to this Note of that different address.

**GENERAL PROVISIONS. NOTICE:** Under no circumstances (and notwithstanding any other provisions of this Note) shall the interest charged, collected, or contracted for on this Note exceed the maximum rate permitted by law. The term "maximum rate permitted by law" as used in

**PROMISSORY NOTE**
(Continued)

Loan No: 7026218730

Page 3

this Note means the greater of  (a) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or  (b) the higher, as of the date of this Note, of the "Weekly Ceiling" or the "Quarterly Ceiling" as referred to in Sections 303.002, 303.003 and 303.006 of the Texas Finance Code. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. I do not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. To the extent allowed by law, I waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note, provided, however, that I shall be entitled to any required notice of default and shall be given all opportunity to cure as required by applicable law. The obligations under this Note are joint and several. This means that the words "I", "me", and "my" mean each and all of the persons signing below.

PRIOR TO SIGNING THIS NOTE, I READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. I AGREE TO THE TERMS OF THE NOTE.

I ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE AND THAT ALL BLANKS WERE FILLED IN PRIOR TO SIGNING. I ALSO ACKNOWLEDGE RECEIPT OF THE DISCLOSURES REQUIRED BY SECTION 50(g), ARTICLE XVI, TEXAS CONSTITUTION AT LEAST 12 DAYS PRIOR TO THE DATE OF THIS NOTE.

THIS DOCUMENT MUST BE EXECUTED AT THE OFFICE OF THE LENDER, AN ATTORNEY AT LAW OR A TITLE COMPANY.

BORROWER:

X_____
KENT FARMER

LASER PRO Lending, Ver. 5.36.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - TX CACFACFRLPL\D20.FC  TR-22991633  PR-TXHELOAN

# EXHIBIT C

# NOTICE CONCERNING EXTENSIONS OF CREDIT

**ACCOUNT NUMBER** 7026218730

Grantor:   KENT FARMER
10507 RAFTER S TRL
HELOTES, TX 78023-3819

Lender:   Bank of America, N.A.
c/o Texas Main Office
901 Main St.
67th Floor
Dallas, TX 75202

NOTICE CONCERNING EXTENSIONS OF CREDIT
DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION:

SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION ALLOWS CERTAIN LOANS TO BE SECURED AGAINST THE EQUITY IN YOUR HOME. SUCH LOANS ARE COMMONLY KNOWN AS EQUITY LOANS. IF YOU DO NOT REPAY THE LOAN OR IF YOU FAIL TO MEET THE TERMS OF THE LOAN, THE LENDER MAY FORECLOSE AND SELL YOUR HOME. THE CONSTITUTION PROVIDES THAT:

(A) THE LOAN MUST BE VOLUNTARILY CREATED WITH THE CONSENT OF EACH OWNER OF YOUR HOME AND EACH OWNER'S SPOUSE;

(B) THE PRINCIPAL LOAN AMOUNT AT THE TIME THE LOAN IS MADE MUST NOT EXCEED AN AMOUNT THAT, WHEN ADDED TO THE PRINCIPAL BALANCES OF ALL OTHER LIENS AGAINST YOUR HOME, IS MORE THAN 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME;

(C) THE LOAN MUST BE WITHOUT RECOURSE FOR PERSONAL LIABILITY AGAINST YOU AND YOUR SPOUSE UNLESS YOU OR YOUR SPOUSE OBTAINED THIS EXTENSION OF CREDIT BY ACTUAL FRAUD;

(D) THE LIEN SECURING THE LOAN MAY BE FORECLOSED UPON ONLY WITH A COURT ORDER;

(E) FEES AND CHARGES TO MAKE THE LOAN MAY NOT EXCEED 3 PERCENT OF THE LOAN AMOUNT;

(F) THE LOAN MAY NOT BE AN OPEN-END ACCOUNT THAT MAY BE DEBITED FROM TIME TO TIME OR UNDER WHICH CREDIT MAY BE EXTENDED FROM TIME TO TIME UNLESS IT IS A HOME EQUITY LINE OF CREDIT;

(G) YOU MAY PREPAY THE LOAN WITHOUT PENALTY OR CHARGE;

(H) NO ADDITIONAL COLLATERAL MAY BE SECURITY FOR THE LOAN;

(I) THE LOAN MAY NOT BE SECURED BY AGRICULTURAL HOMESTEAD PROPERTY, UNLESS THE AGRICULTURAL HOMESTEAD PROPERTY IS USED PRIMARILY FOR THE PRODUCTION OF MILK;

(J) YOU ARE NOT REQUIRED TO REPAY THE LOAN EARLIER THAN AGREED SOLELY BECAUSE THE FAIR MARKET VALUE OF YOUR HOME DECREASES OR BECAUSE YOU DEFAULT ON ANOTHER LOAN THAT IS NOT SECURED BY YOUR HOME;

(K) ONLY ONE LOAN DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MAY BE SECURED WITH YOUR HOME AT ANY GIVEN TIME;

(L) THE LOAN MUST BE SCHEDULED TO BE REPAID IN PAYMENTS THAT EQUAL OR EXCEED THE AMOUNT OF ACCRUED INTEREST FOR EACH PAYMENT PERIOD;

(M) THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A WRITTEN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER; AND IF YOUR HOME WAS SECURITY FOR THE SAME TYPE OF LOAN WITHIN THE PAST YEAR, A NEW LOAN SECURED BY THE SAME PROPERTY MAY NOT CLOSE BEFORE ONE YEAR HAS PASSED FROM THE CLOSING DATE OF THE OTHER LOAN;

(N) THE LOAN MAY CLOSE ONLY AT THE OFFICE OF THE LENDER, TITLE COMPANY, OR AN ATTORNEY AT LAW;

(O) THE LENDER MAY CHARGE ANY FIXED OR VARIABLE RATE OF INTEREST AUTHORIZED BY STATUTE;

(P) ONLY A LAWFULLY AUTHORIZED LENDER MAY MAKE LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

(Q) LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MUST:

   (1) NOT REQUIRE YOU TO APPLY THE PROCEEDS TO ANOTHER DEBT EXCEPT A DEBT THAT IS SECURED BY YOUR HOME OR OWED TO ANOTHER LENDER;

   (2) NOT REQUIRE THAT YOU ASSIGN WAGES AS SECURITY;

   (3) NOT REQUIRE THAT YOU EXECUTE INSTRUMENTS WHICH HAVE BLANKS LEFT TO BE FILLED IN;

   (4) NOT REQUIRE THAT YOU SIGN A CONFESSION OF JUDGMENT OR POWER OF ATTORNEY TO ANOTHER PERSON TO CONFESS JUDGMENT OR APPEAR IN A LEGAL PROCEEDING ON YOUR BEHALF;

   (5) PROVIDE THAT YOU RECEIVE A COPY OF ALL DOCUMENTS YOU SIGN AT CLOSING;

   (6) PROVIDE THAT THE SECURITY INSTRUMENTS CONTAIN A DISCLOSURE THAT THIS LOAN IS A LOAN DEFINED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

   (7) PROVIDE THAT WHEN THE LOAN IS PAID IN FULL, THE LENDER WILL SIGN AND GIVE YOU A RELEASE OF LIEN OR AN ASSIGNMENT OF THE LIEN, WHICHEVER IS APPROPRIATE;

   (8) PROVIDE THAT YOU MAY, WITHIN 3 DAYS AFTER CLOSING, RESCIND THE LOAN WITHOUT PENALTY OR CHARGE;

   (9) PROVIDE THAT YOU AND THE LENDER ACKNOWLEDGE THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LOAN CLOSES; AND

   (10) PROVIDE THAT THE LENDER WILL FORFEIT ALL PRINCIPAL AND INTEREST IF THE LENDER FAILS TO COMPLY WITH THE LENDER'S OBLIGATIONS UNLESS THE LENDER CURES THE FAILURE TO COMPLY AS PROVIDED BY SECTION 50(a)(6)(Q)(x), ARTICLE XVI, OF THE TEXAS CONSTITUTION; AND

Loan No: 7026218730

## NOTICE CONCERNING EXTENSIONS OF CREDIT
### (Continued)

Page 2

(R)  IF THE LOAN IS A HOME EQUITY LINE OF CREDIT:

(1)  YOU MAY REQUEST ADVANCES, REPAY MONEY, AND REBORROW MONEY UNDER THE LINE OF CREDIT;

(2)  EACH ADVANCE UNDER THE LINE OF CREDIT MUST BE IN AN AMOUNT OF AT LEAST $4,000;

(3)  YOU MAY NOT USE A CREDIT CARD, DEBIT CARD, SOLICITATION CHECK, OR SIMILAR DEVICE TO OBTAIN ADVANCES UNDER THE LINE OF CREDIT;

(4)  ANY FEES THE LENDER CHARGES MAY BE CHARGED AND COLLECTED ONLY AT THE TIME THE LINE OF CREDIT IS ESTABLISHED AND THE LENDER MAY NOT CHARGE A FEE IN CONNECTION WITH ANY ADVANCE;

(5)  THE MAXIMUM PRINCIPAL AMOUNT THAT MAY BE EXTENDED, WHEN ADDED TO ALL OTHER DEBTS SECURED BY YOUR HOME, MAY NOT EXCEED 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LINE OF CREDIT IS ESTABLISHED;

(6)  IF THE PRINCIPAL BALANCE UNDER THE LINE OF CREDIT AT ANY TIME EXCEEDS 50 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME, AS DETERMINED ON THE DATE THE LINE OF CREDIT IS ESTABLISHED, YOU MAY NOT CONTINUE TO REQUEST ADVANCES UNDER THE LINE OF CREDIT UNTIL THE BALANCE IS LESS THAN 50 PERCENT OF THE FAIR MARKET VALUE; AND

(7)  THE LENDER MAY NOT UNILATERALLY AMEND THE TERMS OF THE LINE OF CREDIT.

THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION.  YOUR RIGHTS ARE GOVERNED BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE.

EACH UNDERSIGNED OWNER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS NOTICE AND HAVING RECEIVED A COPY OF THIS NOTICE.  THIS NOTICE IS DATED 01-17-2008.

X_____
KENT FARMER

# EXHIBIT D

9093
873845385



Home Loans

P.O. BOX 961206
FORT WORTH, TX 76161-0206

JUNE 13, 2010

007829 - 028389
KENT FARMER
218 QUINLAN ST
STE 351
KERRVILLE, TX 78028-5314

Request For Proof Of Insurance

Notification Date:   JUNE 13, 2010
Loan Number:         873845385
Property Address:    10507 RAFTER S TRL
                     HELOTES TX  78023

Dear Valued Customer:

Thank you for allowing us to service your mortgage. We previously sent you a letter requesting that you provide us proof of your insurance. As of the date of this letter, we have not yet received the much-needed information.

If you have not yet sent us a copy of your homeowners insurance policy, please do so within 35 days of the date of the letter or have your agent forward a copy of your policy, including your loan number to (800) 293-8158 or alternately:

> BAC HOME LOANS SERVICING, LP
> P.O. BOX 961206
> FORT WORTH, TX 76161-0206

While we are sure that you know the importance of maintaining and providing evidence of current insurance coverage, we must advise you that we may have to purchase coverage for you. If we purchase coverage on your behalf, the charge will be $2,501.00 based on a coverage amount of $156,019.00 and will cover the period from 05/16/2010 to 05/16/2011. The charge may change and is based on the information available to the insurance company at the time of this letter.

The coverage that we purchase will be different than your current policy and in most cases is more expensive and will not protect you as fully as a policy you could purchase. The insurance that we will place does not cover liability, flood or earthquake and does not cover personal property loss. It is really **very** important that you attempt to obtain coverage immediately to avoid this lender placed coverage. If we must go forward with purchasing this coverage, the charges will be charged to your escrow/impound account and your monthly payment will be adjusted accordingly. Please note that our licensed affiliated insurance agency may receive a commission for placing this insurance, which may be purchased from an affiliated insurer.

If you have any questions about this letter, or our hazard insurance requirements enclosed with this correspondence, please contact our Customer Service Department at (866) 265-3321, Monday through Friday, 8:00 a.m. to 9:00 p.m. Eastern Standard Time. We appreciate your immediate attention to this matter helping us ensure that your property has appropriate coverage.

Sincerely,

Hazard/Flood Insurance Unit

BH002

## BAC HOME LOANS HAZARD INSURANCE REQUIREMENTS

In order to protect the dwelling structure, BAC Home Loans requires that you maintain hazard insurance. Below are the minimum requirements:

- Must be a fire and extended coverage policy
- Must list your loan number on all policies, billings or other correspondence
- Must not limit or exclude from coverage (in whole or in part) damage from windstorm, hurricane, hail or any other perils that are a part of the extended coverage endorsement
- Must be on REPLACEMENT COST BASIS, where available, and be in an amount equal to the lower of:
  - 100% of the insurable value of the improvements as established by the insurer or;
  - The unpaid principal balance of the loan
  - Not withstanding the foregoing, if the unpaid principal balance is less than 80% of the insurable value of the improvements, the coverage amount must be at least 80% of the insurable value
- Rent loss coverage is required for non-owner - occupied properties
- For coverage amounts of $252,700 or less, the maximum deductible is the higher of $1000 or 1% of the policy's dwelling coverage
- For coverage amount greater than $252,700, the maximum deductible is the higher of $2500 or 1% of the policy's dwelling coverage
- The insurance policy must be issued by an insurance company acceptable to BAC Home Loans and licensed or otherwise authorized by laws to conduct business in the jurisdictions in which the dwelling structure is located
- Your policy must be written by an insurance company with either the AM Best's rating of "B" or an AM Best's Financial Performance Rating of VI or better
- The name on the policy must be the same as the mortgagor/trustor/grantor of the security instrument or current owner in the case of an assumption

The policy must have the following loss payee or mortgagee clause:

> BAC HOME LOANS SERVICING, LP
> ITS SUCCESSORS AND/OR ASSIGNS A.T.I.M.A.
> P.O. BOX 961206
> FORT WORTH, TX 76161-0206

Due to changes in federal or state laws or regulations, BAC Home Loans may modify its insurance requirements to include additional types or amounts of coverage. If BAC Home Loans makes a change, we will notify you so that you may purchase the required coverage.

# EXHIBIT E

**Bank of America** ⋙
**Home Loans**

9093
873845385

P.O. BOX 961206
FORT WORTH, TX  76161-0206

JULY 12, 2010

002622 - 007121
KENT FARMER
218 QUINLAN ST
STE 351
KERRVILLE, TX 78028-5314

RE:    10507 RAFTER S TRL
          HELOTES TX  78023

Loan #:  9093-0000-873845385

Collateral: Hazard

### **Insurance Deficiency Notice**

Dear BAC Home Loans Customer:

On 07/11/2010, we received your insurance document by fax/mail for the property referenced above. Thank you for attempting to resolve this issue. Unfortunately the document does not provide the information required to cure the insurance deficiency that currently exists on your loan for the following reason(s):

**Insurance policy received does not provide adequate proof of insurance for the current term.**

Your loan agreement requires that you have current evidence of insurance. Please remit current evidence of hazard insurance for the property listed above. If we do not receive your insurance the current deficient status of your loan will remain. In addition, you will be billed for any insurance purchased to protect our interest in the property. This may be significantly more expensive and provide less coverage than you could obtain on your own.

When sending proof of coverage, we require the mortgagee clause provided below be included on your policy

**Mortgagee Clause:**
          BAC HOME LOANS SERVICING, LP
          ITS SUCCESSORS AND/OR ASSIGNS A.T.I.M.A.
          P.O. BOX 961206
          FORT WORTH, TX 76161-0206

It is important that a copy of your current hazard insurance policy be forwarded to us.

**By Phone:**     Contact us at (866) 265-3321 with the following information:
          •     Insurance agent/carrier name and phone number
          •     Insurance policy number
**By Fax:**     Fax a copy of your current hazard insurance policy to: (800) 293-8158
**By Mail:**     Send us a copy of your current hazard insurance policy to the following address:
          BAC HOME LOANS SERVICING, LP
          P.O. BOX 961206
          FORT WORTH, TX 76161-0206

You may also access your loan information by signing in to online banking at www.bankofamerica.com.

If we can answer any questions about this request or provide further assistance, please contact our Customer Service Department at (866) 265-3321, Monday through Friday, 8 a.m. to 9 p.m. Eastern.

We appreciate your business and are eager to provide service that will exceed your expectations. Please contact BAC Home Loans for your future financial needs.

Sincerely,

Insurance Department

AR81897/BDD2IJ

# EXHIBIT F

9093
873845385

 **Bank of America**

**Home Loans**

P.O. BOX 961206
FORT WORTH, TX  76161-0206

JULY 21, 2010

004178 - 016523
KENT FARMER
218 QUINLAN ST
STE 351
KERRVILLE, TX 78028-5314

Certificate Number:   B8543843
Master Policy Number: 5705-0002
Insurance Company:   BALBOA INSURANCE COMPANY

## CERTIFICATE OF COVERAGE PLACEMENT

Property Address:   10507 RAFTER S TRL
                   HELOTES TX  78023
Loan Number:       873845385
Effective Date:      05/16/2010            Expiration Date:      05/16/2011

AMOUNT OF INSURANCE        ANNUAL CHARGES
Coverage Limit:   $156,019.00        $2,501.00

Deductibles:
All perils
Residential Occupied:   $500 (except GU, NM, OK, VT and WV - Deductible $250)
Residential Vacant:      $750 (except OK, NM and VT - Deductible $500; GU and WV - Deductible $1,000)

Commercial Occupied:  $500 (except CA and GU - Deductible $1,000)
Commercial Vacant:
- $1,000 or 2% of the insured amount, whichever is greater
- Vandalism and Malicious Mischief $5,000 or 2% of the insured amount, whichever is greater
(Deductible may change if occupancy changes.)

For Residential properties in the following states:  AL, FL, GA, HI, LA, MS, NC, SC and TX
Windstorm/Hail Deductible Applies:  Greater of $2,000 or 2% of limit of liability

Dear Valued Customer:

We did not receive the insurance information we requested in our prior notices to you, and we have purchased one year of insurance coverage to protect the property effective as of the expiration/cancellation of your prior policy. Please review this document carefully. As we previously told you, the coverage we purchased insures for damage to your dwelling, but not its contents. It is different than a standard policy, is probably more expensive, may have higher deductibles, and does not protect you from risks typically included in a homeowners policy. For example, it will not cover loss, damage, or theft to personal property; or injuries to persons or property for which you may be liable. Also, it does not cover worker's compensation or damage due to flood or earthquake. The amount of coverage may be insufficient to fully replace or repair your property if a loss occurs.

If you already have your own insurance or will soon obtain it, evidence of coverage, or a bill for us to pay your premium should be faxed to (800) 293-8158, or mailed to the following address:

        BAC HOME LOANS SERVICING, LP
        P.O. BOX 961206
        FORT WORTH, TX 76161-0206

BH003

RE:   KENT FARMER
      Loan Number:  873845385

We will cancel our lender-placed insurance as of the effective date of the insurance policy you provide. If the insurance you obtain results in coverage not effective the date your prior policy cancelled, we will charge you an earned premium and any state-imposed fee for the period that no borrower-placed coverage was in place. Any premium expenses arising from our lender-placed insurance, and fees paid pursuant to state law, will be billed to you on a monthly basis through your escrow account. Please note that our licensed affiliated insurance agency may receive a commission for placing this insurance, which may be purchased from an affiliated insurer. If you do not have an escrowed loan, we will need to adjust your monthly payment to reimburse us for the advanced premium and any fees paid under state law, and we may collect for the next year's premium. Any bank funds we advance to pay a premium and any such state-imposed fees are your obligation and are secured by your security instrument.

We urge you to obtain as soon as possible an insurance policy of your choice, through an insurance agent or company of your choice, which meets, at a minimum, BAC Home Loans' requirements (see attached for details) so that we may cancel our lender-placed coverage.

If your loan balance is below the amount of your last known hazard insurance coverage amount (the coverage amount shown above), then you may submit a written request to reduce the coverage to the amount of the outstanding principal balance of your loan. By doing so, however, you will be requesting coverage in an amount that may not be adequate to rebuild your home in the event of a large or total loss and may not cover your equity interest in your home. You should contact your insurance agent to review your insurance needs and to help you determine the coverage amount that is right for you. To request the lower, unpaid principal balance coverage amount, you will need to complete all items on the enclosed form, sign it, and then mail the form to the following address shown below. We must receive the completed form within 35 days from the date posted on this letter or the coverage amount will remain as shown above.

If you have any questions about this letter, or our hazard insurance requirements, please contact our Customer Service Department at (866) 265-3321, Monday through Friday, 8:00 a.m. to 9:00 p.m. Eastern Standard Time.

Sincerely,


Hazard/Flood Insurance Unit


Enclosure

## BAC HOME LOANS HAZARD INSURANCE REQUIREMENTS

In order to protect the dwelling structure, BAC Home Loans requires that you maintain hazard insurance. Below are the minimum requirements:

- Must be a fire and extended coverage policy
- Must list your loan number on all policies, billings or other correspondence
- Must not limit or exclude from coverage (in whole or in part) damage from windstorm, hurricane, hail or any other perils that are a part of the extended coverage endorsement
- Must be on REPLACEMENT COST BASIS, where available, and be in an amount equal to the lower of:
    - 100% of the insurable value of the improvements as established by the insurer or;
    - The unpaid principal balance of the loan
    - Not withstanding the foregoing, if the unpaid principal balance is less than 80% of the insurable value of the improvements, the coverage amount must be at least 80% of the insurable value
- Rent loss coverage is required for non-owner - occupied properties
- For coverage amounts of $252,700 or less, the maximum deductible is the higher of $1000 or 1% of the policy's dwelling coverage
- For coverage amount greater than $252,700, the maximum deductible is the higher of $2500 or 1% of the policy's dwelling coverage
- The insurance policy must be issued by an insurance company acceptable to BAC Home Loans and licensed or otherwise authorized by laws to conduct business in the jurisdictions in which the dwelling structure is located
- Your policy must be written by an insurance company with either the AM Best's rating of "B" or an AM Best's Financial Performance Rating of VI or better
- The name on the policy must be the same as the mortgagor/trustor/grantor of the security instrument or current owner in the case of an assumption

The policy must have the following loss payee or mortgagee clause:

> BAC HOME LOANS SERVICING, LP
> ITS SUCCESSORS AND/OR ASSIGNS A.T.I.M.A.
> P.O. BOX 961206
> FORT WORTH, TX 76161-0206

Due to changes in federal or state laws or regulations, BAC Home Loans may modify its insurance requirements to include additional types or amounts of coverage. If BAC Home Loans makes a change, we will notify you so that you may purchase the required coverage.

## EVIDENCE OF LENDER-PLACED INSURANCE
Residential Property Fire Insurance Coverage
Lenders Protection program

## BALBOA INSURANCE COMPANY
(a stock company)
Home Office
3349 Michelson Drive, Suite 200, Irvine, CA 92612-8893

Date:  07/21/2010

Control Number: B8543843

Master Policy Number: 5705-0002

Loan Number: 9093-0000-873845385

NAMED INSURED:
  BAC HOME LOANS
  100 N TYRON ST
  CHARLOTTE, NC 28202-4000

BORROWER:
  KENT FARMER
  218 QUINLAN ST
  STE 351
  KERRVILLE, TX 78028-5314

Coverage Period:  From: 05/16/2010 Until: 05/16/2011, beginning and ending at 12:01 am Standard time at the DESCRIBED LOCATION.

DESCRIBED LOCATION:
10507 RAFTER S TRL
HELOTES TX 78023

LIMIT OF LIABILITY FOR RESIDENTIAL PROPERTY:

  $156,019.00

DEDUCTIBLES:

ALL PERILS EXCEPT WINDSTORM/HAIL
  $500.00 Residential Occupied
  $750.00 Residential Vacant

WINDSTORM or HAIL DEDUCTIBLES: Greater of $2,000 or 2% of limit of liability

PREMIUM:

| | | |
|---|---|---|
| Insurance premium: | $2,501.00 |
| Total premium: | $2,501.00 |

Your lender has ordered insurance on the above-listed property for the coverage amount and premium indicated. This insurance may not sufficiently protect your interest in the property and covers only loss to the dwelling and other structures. Coverage is limited to perils insured under our agreement with your lender and is subject to all limitations and exclusions set forth thereon. Coverage is not afforded for building code upgrades.

This memorandum is for information only. It neither amends, extends nor alters the coverage afforded under the agreement it describes.

To report a claim, call:  1.800.323.7466
For other inquiries, call:  (866) 265-3321

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the insurance company's toll-free telephone number for information or to make a complaint at

**1-888-308-8577**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, TX 78714-9104
FAX:   (512) 475-1771
Web:   http://www.tdi.state.tx.us
Email:  ConsumerProtection@tdi.state.tx.us

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de la compañia para informacion o para someter una queja al

**1-888-308-8577**

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de compañilas, coberturas, derechos o quejas al

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas:

P.O. Box 149104
Austin, TX 78714-9104
FAX:   (512) 475-1771
Web:   http://www.tdi.state.tx.us
Email:  ConsumerProtection@tdi.state.tx.us

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con la compañia primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

IN01TX00 R0707

KENT FARMER
218 QUINLAN ST
KERRVILLE, TX  78028-5314

JULY 21, 2010

LOAN NUMBER: 873845385
CERTIFICATE NUMBER: B8543843

Please note that if you have been unable to obtain insurance coverage, you may be able to purchase coverage at a lower cost than the lender-placed coverage we have obtained, through the Texas FAIR Plan. FAIR Plan coverage may be purchased through an authorized licensed Texas agent. To find an authorized producer you can go to the Texas FAIR Plan Association website at **http://www.texasfairplan.org**. Alternatively, to search for an agent in your area, you may call the Texas Department of Insurance Market Assistance Program at 1-800-979-6440. You may also obtain more information at **http://www.helpinsure.com** or contact them at 1-866-695-6873.

# EXHIBIT G



Now ScoreCard® Rewards You and Your Cardholders Even More... Introducing ScoreMore™!

FIS

Search  American Banker

for  [          ]  Go

About the Banking Group

Log In

Wednesday, April 6, 2011, as of 01:59 PM EDT

Today's Paper  Tools & Data  Topics  BankThink  Upcoming Conferences  My Account  Custom Email  Feedback  Contact  RSS

Sign me up now for full access. | Subscribe | Take a free trial (including email alerts). | Register | Get help from customer service. | Inquire

**Transform your online banking to increase profitability.**

Cards/Payments
Community Banking
Markets
Mortgages
National/Global
Retail Delivery
Technology
Viewpoints
Washington/Regulatory
Wealth Management
Mobile Banker
News by State
Blogs & Scans
Special Reports
Company Index
Resources
Customer Service
Advertise/Media Kit
Upcoming Conferences
CareerZone
Marketplace
White Papers
Banker of the Year/ Best in Banking
Financial Services Executive Forum
The FinTech 100
25 Most Powerful Women in Banking
The Innovators

**Upcoming Conferences**

23rd Annual Card Forum & Expo
April 27-29, 2011
Fontainebleau Miami Beach, Miami, FL

5th Annual Mobile Banking & Emerging Applications Summit
June 5-7, 2011
Hilton Riverside, New Orleans

M&A Symposium: Identify & Execute

# Ties to Insurers Could Land Mortgage Servicers in More Trouble

*Force-placed policies impose costs on both homeowner, investor*

American Banker | Wednesday, November 10, 2010

By Jeff Horwitz

🖨 Print  ✉ Email  🖨 Reprints  🖾 Feedback  [RSS]

**Correction:** *An earlier version of this story incorrectly stated that Bank of America did not comment for the record. The bank's comment is now included.*

When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.

Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

"There's no arm's-length transaction here, and that creates all sorts of incentives for the servicer to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit," said Diane Thompson, of counsel for the National Consumer Law Center. "Servicers and insurers have turned this into a gravy train."

Sometimes the arrangements resemble simple kickbacks: Court documents show that a subsidiary of the country's largest specialty insurer paid undisclosed "commissions" for the rights to a servicer's force-placed business.

State court filings show alleged abuse in which banks charged borrowers for unnecessary insurance and backdated policies providing coverage retroactively. Often the insurance was acquired only after banks stopped advancing the premiums of delinquent borrowers' escrowed loans, causing those cheaper and more comprehensive policies to expire. In response to questions from American Banker, federal and state officials said that some practices that industry trade groups defend may not be legal.

"It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed," said Brian Sullivan, spokesman for the Department of Housing and Urban Development. Foreclosure defense and legal aid attorneys

## RELATED ARTICLES

Fannie Plans Technology Outsourcing

Solution for Underwater Borrowers: Keep the Mortgage, Switch the House

Why Bet $1B on Green Tree?

Warren Again Defends Role in Servicer Settlement Talks

Small Win Aside, Court Challenge to Mortgage Broker Pay Rule Still 'a Long Shot'

**RELATED GRAPHIC**

Sharing in the Profits

Click to enlarge

**RELATED GRAPHIC**

Agent, Writer

Click to enlarge

**RELATED LINKS**

Losses from Forced-Place Insurance Are Beginning to Rankle Investors - November 10, 2010

Feedback: Don't Let Bad Actors Tarnish Force-Placed Insurance - November 10, 2010

Advertisement

REPLAY

Good online experiences are great for business.

Discover Online Customer Experience Management

Learn More »

tealeaf




| Most Popular | Viewed | Emailed |
| --- | --- | --- |

1. Fed Rules Beget a (Mostly) Volume-Based Mortgage Commission Model
2. Regulators Ready Enforcement Orders Against Servicers as State AG Talks Stall
3. How a Good Customer Became Liability
4. Regulations Are Burying Small Banks Alive
5. Debit Rules Not Set in Stone, But Rewards Cuts May Be
6. Court Issues 11th-Hour Stay on Mortgage Loan Officer Pay Rule
7. Facebook and Google Encroach on Banks' Turf
8. FHFA: GOP Bills Could Do More Harm than Good
9. Mission Impossible? Deducing Banks' Fortunes from Jobs Data Proves Tough
10. Jack Henry Lets Consumers Control Online Banking's Look

Sponsored Data

June 15-16, 2011
The Harvard Club,
New York City, NY

**6th Annual
Underbanked
Financial Services
Forum**
June 8-10, 2011
Hilton New Orleans
Riverside, New
Orleans, LA

**2nd Annual Buying
and Selling
Distressed Mortgage
Portfolios**
June 16-17, 2011
Roosevelt Hotel, New
York, NY

Advertisement



THE BEST
KEEPS
GETTING
BETTER...

Identify the
factors driving
bank ROAE
with SNL's new
Performance
Analytics.

FREE
OFFERS

SNL Financial
Better all the time.

Web Seminar
Supply Chain Finance:
7 Actions to
Gain a
Competitive
Advantage

pulse
We see debit in
everything we do.
Click here to profit
from our passion.

Transform your
online banking
to increase
profitability.

say force-placed insurance is found on most of the severely delinquent loans in this country. If so, the cost to investors may well be in the billions of dollars.

"This is clearly not in the investors' interest," said Amherst Securities analyst Laurie Goodman, who in May noted the potential for misconduct with Bank of America's force-placed -insurer subsidiary, Balboa Insurance Group. "Servicers are getting a huge chunk of money from force-placed insurance, and investors pay for it by higher loss severity at the liquidation of the loan."

With little regulatory oversight or even private investor awareness, force-placed insurance has helped make drawn-out foreclosures lucrative for servicers — far more so, in some cases, than helping a borrower return to performing status. As the intermediary between borrower and investor, servicers appear to be benefiting themselves at the expense of both.

### Backdated Coverage

When attorney Jeffrey Golant took on his first forced-placement case, he thought he was looking at an administrative mistake.

A solo practitioner in Pompano Beach, Fla., Golant splits his time between foreclosure defense and insurance cases. He had been referred his first forced-placement case by his mother, Margery Golant — also a longtime foreclosure defense attorney — in May of 2008 when the dispute veered into insurance territory.

The problems should have been quick to sort out, Golant recalls. His client was current on her mortgage and claimed the lapse of insurance coverage on her home was the result of her previous insurer's error. Much of the new policy's coverage was redundant, Golant said, duplicating flood and wind policies that had remained in place. Moreover, billing her for expensive retroactive hurricane protection, for a year when there had been no significant storms, struck Golant as inherently ridiculous.

"I really thought they'd added an extra digit," he said.

But the servicer that had requested the policy — nominally Zions Bancorp., though like many regional banks, the company outsources its servicing and does not involve itself in loan-level decisions — wouldn't back down. The backdating was appropriate because "Had there been damage to your property during the uninsured time … you would have benefited significantly," the servicer said in one letter.

The Mortgage Bankers Association told American Banker that retroactive coverage is necessary to prevent gaps in insurance. But asked for an opinion on backdating a policy by nine months, the National Association of Insurance Commissioners told American Banker that insurance is "prospective in nature." Therefore, policies "should not be back-dated to collect premiums for a time period that has already passed," the trade group for state insurance regulators said.

The case got stranger when Golant's client visited the address listed for the insurer in an unsuccessful attempt to sort things out, he said. While the people there claimed to represent the servicer, they were operating out of an office belonging to a force-placed policy insurer since acquired by QBE Insurance Group.

Golant didn't understand why the insurer would be speaking on behalf of the servicer. But shortly after he began asking questions about the relationship between servicer and insurer, the case settled. Confidentially. At the insurer's request.

With the matter resolved, it would have made sense for a Florida solo practitioner who handles as many as 50 cases at any one time to move on. Golant, however, started investigating the connections between multibillion-dollar banks and specialty insurers.

"Frankly, it was their speed and willingness to settle that made me think they were not at all confident about the arrangement," Golant said. "I was still in the dark. But I got curious."

Collaborating with his mother, Golant says he began to take on more force-placed insurance cases, often agreeing to bill the borrower only if he won. Cases he pointed out to American Banker show no shortage of questionable alleged practices. In some instances, servicers force-placed insurance on borrowers in excess of their mortgage's face value and property's overall worth. (A representative of the Mortgage Bankers Association said the industry often is required to reinsure a property up to the cost of its replacement value, even if that's in excess of the mortgage.)

In other instances, servicers force-placed duplicative insurance on residents of condominium associations that insured their members' properties. In yet more, servicers had stopped advancing the premiums for a delinquent borrower's escrowed private insurance, allowing it to expire. When it did, they bought far more expensive force-placed insurance to replace it, and began advancing the premiums on that. This — a common practice, Golant says — was not just harmful to borrowers. It was inexplicable from the point of view of protecting investors.

What all the cases had in common was astronomically priced force-placed insurance, he said. There is no doubt that borrowers who aren't paying for their own insurance pose a heightened insurance risk. But servicers were billing Golant's clients for policies that cost as much as 10 times as much as the insurance they replaced. In one example confirmed by American



gomez
US Banking Benchmarks Top 5
Website Performance Index

| Rank | Site |
|------|------|
| 1 | USBank |
| 2 | Regions Bank |
| 3 | HSBC |
| 4 | Wachovia |
| 5 | M&T Bank |

SEE DETAILED RESULTS

Click here for more banks and more data.

Data range: March 20 – April 3, 2011

### WHITE PAPERS

**Risk Management: The Emerging Waves of Regulation**

**Mortgage Originator and Broker Compensation Rules**

**Instant Financial Card Issuance**

**Massachusetts Bank Reduces Costs Through Outsourced Wholesale Lockbox**

**Remote Deposit Capture (RDC) Goes Mainstream**

### WEB SEMINARS

**Doing More with Less: Financial Innovators Look to LEAN**
May 5, 2011

**Driving Branch Transformation with Teller Image Capture**
May 4, 2011

**FDIC and Overdraft: FAQ and Assessing Risks**
April 21, 2011

**Supply Chain Finance: 7 Actions to Gain a Competitive Advantage**
April 14, 2011

**Using ERM To Optimize Your Bank's Strategic Decision Process**
Available on Demand

Advertisement



How will the new
regulatory reform
impact your financial
institution?

Learn more
with PwC's new
CLOSER LOOK
series

pwc

"PwC" refers to PricewaterhouseCoopers LLP



Banker, an $80,000 property standing on a $40,000 lot was force-placed with a policy costing $10,000. Put another way, one year of insurance payments would strip away 13% of the structure's total value.

It wasn't just off-brand and subprime servicers who were tacking the high-priced policies on to borrowers' mortgage bills. It was the country's biggest banks, from JPMorgan Chase & Co. to Wachovia, now part of Wells Fargo & Co. Why did they seem so eager to purchase high-priced insurance on the homes of already struggling borrowers?

Golant got his answer in a case in which EverBank Financial Corp's servicing arm had allegedly allowed a borrower's $4,000 escrowed insurance to lapse in error and then replaced it with a policy costing more than $33,000. In response to written questions, a subsidiary of Assurant, one of the country's biggest specialty insurers, revealed that it hadn't kept all the money that EverBank's servicing operation had paid it. Instead it immediately paid EverInsurance, the servicer's subsidiary, a $7,100 "commission" and left the door open to further compensation.

For Golant, this set off alarm bells: instead of trying to place affordable insurance on his client's home, EverBank had taken what was at minimum a $7,100 cut. That was more money than EverBank would ever collect from actually servicing the loan, and EverBank had done nothing to earn it — except let Assurant write a high-priced policy on his client's house. (According to the MBA data cited by MortgageDaily.com, servicers earned on average $51 per loan last year.)

"The 'commissions' that [Assurant] paid … were in fact kickbacks," the attorney wrote in a complaint still being litigated. "This incentivized EverHome to select the most expensive force-placed coverage available, and to force-place insurance as frequently as possible."

EverBank is in the process of going public, and could not comment because of SEC restrictions on its public statements, a spokeswoman for the bank said. But, at least in substance, its relationship with an insurer is hardly unique. Agreements providing banks with commissions on force-placed insurance appear to be standard for many players, including one of the country's largest — Wells Fargo.

Wells declined an on-record interview for this story, though it acknowledged relationships with three force-placed insurers and provided other guidance. JPMorgan Chase did not speak on record with *American Banker*. A spokesman for Bank of America said by email it buys force-placed insurance only "after several attempts have been made to notify borrowers that their insurance has lapsed and to remind them of their obligation to maintain continuous coverage." B of A is seeking a buyer for Balboa, which it inherited with its 2008 acquisition of Countrywide Financial Corp.

But the MBA defended commissions on force-placed business. It is common practice for an insurer to pay fees for business referrals, said Vicki Vidal, a vice president at the trade group. Asked if those commissions inflated the price that homeowners or investors ultimately paid, she said they did not.

"The rate is separate from the commission," Vidal said, adding that state insurance regulators can set limits on what premiums are allowed.

### Circular Arrangement

Commission fees aren't the only way major servicers profit on the force-placed policies in their portfolio. Some, including JPMorgan Chase, have adopted a roughly equivalent if slightly more sophisticated method of profiting from force-placed reinsurance: They reinsure it.

Evidence of the practice comes from Assurant's Securities and Exchange Commission filings as well as the banking companies' boilerplate language for notifying borrowers of their intent to bill them for a force-placed policy.

JPMorgan Chase's force-placed insurance "will have significantly higher premiums than standard insurance premiums," the banking company noted in one letter to a borrower last year, and "Some or all of these premiums will be reinsured through an insurance company that is an affiliate of Chase."

JPMorgan Chase declined to specify what insurer it typically works with, but Assurant's annual report describes precisely such a relationship from an insurer's perspective. In an effort to align its interests with its servicer customers, the company will often reinsure the policies it writes with the same servicer that requested them.

"Such arrangements allow significant flexibility in structuring the sharing of risks and profits on the underlying business," Assurant notes.

The interests of the two parties are so aligned, in fact, that in many cases there ceases to be a clear difference between the entity purchasing insurance and the entity selling it.

According to both Assurant's SEC filings and the marketing materials of a subsidiary of rival QBE Insurance Group, the insurers don't just write policies on request — they also enter into long-term agreements to detect uninsured properties in their clients' servicing portfolios and perform other back-office functions. It was precisely such an arrangement that Golant's first

client ran into when she tried to visit her servicer, he says — the insurance company employees had taken over the servicer's role.

Case 8:11-cv-00739-CJC-RNB   Document 1   Filed 05/13/11   Page 54 of 60   Page ID #:54

Like the direct commission payments that Golant discovered, reinsurance deals cut servicers in on insurer profits. They also come with another potential advantage for the insurer: they provide an incentive for the servicer not to pursue claims, creating an apparent conflict of interest. As a representative of investors, the servicer should vigorously pursue any and all claims arising from its forcibly insured portfolio. But because the servicer reinsures the policies it purchases, any claims it brings could potentially come out of its own profits.

For insurers, opening the door to this circular arrangement has its drawbacks. Assurant warns in investor filings that having reinsuring business with the client that provided the policy, rather than a reinsurer of the company's own choosing, can pose a credit risk: the bank fails to eat its share of claims. Assurant mitigates this danger, it says, by requiring some of its client-counterparties to obtain letters of credit from other financial institutions.

The more vexing issue for Assurant, however, seems to be that giving the servicers part of the deal leaves less for the company. In a section discussing risks arising from servicer industry consolidation, Assurant warns that giant servicers are compressing margins and that it may receive a lower share of premiums if it provides them with bigger reinsurance deals.

Nonetheless, Assurant sees force-placed insurance as its future. The unit handling force-placed insurance has accounted for $811 million of its $879 million in profits during the last two years, and its "business strategy is to pursue long-term growth in creditor-placed homeowners insurance" as well as expand that business into auto insurance and related areas.

Assurant declined to be interviewed for this story, and did not address questions on conflict of interest concerns. But the company, which also provides health, corporate and other types of insurance, issued a statement defending its general force-placed business practices.

"Lender-placed insurance programs are regulated in all states and we comply with those regulations," the statement reads in part. "We believe our rates to be among the lowest in the industry."

QBE Insurance, the parent of the insurer involved in Golant's first force-placed case, did not respond to requests for comment.

The MBA's Vidal denied that reinsurance deals posed a conflict of interest, suggesting they may only cover catastrophic losses.

"Don't get the impression that everyone has reinsurance capacity," she said. "But to the extent they do, they're obviously getting paid for absorbing a portion of the risk."

**"No Incentive" To Shop**
Force-placed insurance isn't inherently objectionable. It makes sense that the coverage's price must be higher than on voluntarily purchased insurance to account for a higher risk — if a hurricane comes through, a homeowner with a stake in a property is more likely to board up the windows than one in foreclosure. In many states regulators provide at least some oversight and limits on acceptable rates. Moreover, force-placing insurance isn't optional for servicers: investor contracts usually require it.

"Realistically, we're doing whatever investors are telling us to do," Vidal said.

But it would be possible for servicers to treat force-placing as a last-ditch form of investor protection conducted at the lowest cost possible. Instead, they have consistently chosen force-placed insurance deals that reward themselves at the expense of their clients — and have sometimes given insurers unfettered access to write policies on their portfolios. Banks have put little effort into justifying their force-placed practices because they were rarely asked about them.

"[T]he cost may be considerably more expensive than insurance you can obtain," says a September letter from SunTrust Banks Inc.'s mortgage unit to a borrower, which cites the baffling — but often repeated — line that high prices are necessary because the policy is underwritten "without inspection." (As a general matter, insurers do not routinely inspect residential properties in the course of underwriting, according to Thompson of the National Consumer Law Center, though a representative of one large insurer told American Banker that it always reserves the right to.) SunTrust declined to comment for this story.

Such practices have been in place for years, yet force-placed insurance has received very little attention outside of the servicing industry. Given the current volume of foreclosure activity and the unprecedented attention that ground-level servicing operations are now receiving, however, that could change.

The Dodd-Frank Act stipulates that charges for force-placed insurance must be "bona fide and reasonable," and correspondence with the National Association of Insurance Commissioners suggest that state regulators are aware of the potential for conflicts of interest in insurer selection. Asked whether pricing in the field is competitive, a representative of the NAIC responded that servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's

interests or one where they are provided with an incentive or inducement to enter into the transaction.

In response to a query by American Banker on possible interest in the force-placed insurance market, the Office of the U.S. Trustee, which oversees bankruptcy trustees and the administration of cases, referred without comment to an Indiana bankruptcy case in which it has asked Wells Fargo to produce documents "that support the belief that Debtors had failed to maintain insurance" and "premium notices; invoices; canceled checks; policies of insurance; insurance binders; and, requests for quotes or bids for insurance."

Wells is obligated to respond later this month.

Neither the U.S. Trustee's query of Wells nor the views of other regulators have filtered down to ground-level servicing practices, said consumer advocates like Thompson.

Golant, who hopes to begin deposing insurance industry officials in his force-placed cases within a few months, said he didn't believe the industry would willingly accept change.

"The banks' profits aren't connected to the performance of the loan," he said. "The people making policy, thinking the servicers are part of the solution to the foreclosure problem, need to understand that."

**More articles in Mortgages**

THUNDERHEAD

About | Advertise/Media Kit | CareerZone | Contact | Inquire | Marketplace | Register | RSS | Site Map | Subscribe | White Papers

American Banker | Bank Technology News | Credit Union Journal | U.S. Banker

Privacy Policy | Subscriber Agreement & Terms of Use

© 2011 American Banker and SourceMedia, Inc. All Rights Reserved.
SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

For information regarding Reprint Services please visit: http://www.americanbanker.com/aboutus/reprint-services-rates.html

Visit other SourceMedia sites:

Select Site

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 739 CJC  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Name & Address: Rebekah L. Bailey
Nichols Kaster PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis MN 55402

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KENT FARMER, as an individual and as a
representative of the classes,

PLAINTIFF(S)

v.

BANK OF AMERICA, N.A, *BAC HOME LOANS*
*SERVICING, L.P., BANC OF AMERICA*
*INSURANCE SERVICES, INC. and BALBOA*
*INSURANCE COMPANY,*
DEFENDANT(S).

CASE NUMBER

SACV 11-739 CJC (RNBx)

SUMMONS

TO:     DEFENDANT(S): _____
_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer
or motion must be served on the plaintiff's attorney,  Rebekah L. Bailey _____, whose address is
Nichols Kaster PLLP, 4600 IDS Center, 80 S. 8th Street, Minneapolis, MN 55402 . If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: __May 16, 2011__

By: ___A. DeAvila_____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed*
*60 days by Rule 12(a)(3)].*

Name & Address: Rebekah L. Bailey
Nichols Kaster PLLP
4600 IDS Center
80 S. 8th Street
Minneapolis MN 55402

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| KENT FARMER, as an individual and as a representative of the classes,<br><br>PLAINTIFF(S)<br><br>v.<br><br>BANK OF AMERICA, N.A, *BAC HOME LOANS SERVICING, L.P., BANC OF AMERICA INSURANCE SERVICES, INC. and BALBOA INSURANCE COMPANY,*<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV 11- 739 CJC (RNBx)<br><br>SUMMONS |

TO:     DEFENDANT(S): _____
_____

     A lawsuit has been filed against you.

     Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Rebekah L. Bailey_____, whose address is _Nichols Kaster PLLP, 4600 IDS Center, 80 S. 8th Street, Minneapolis, MN 55402_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __May 16, 2011__          By: ___A. DeAvila_____

                                              Deputy Clerk

                                        *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                         **SUMMONS**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>Kent Farmer, as an individual and as a representative of the classes | DEFENDANTS<br>Bank of America, N.A., BAC Home Loans Servicing, L.P., Banc of America Insurance Services, Inc., Balboa Insurance Company |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Rebekah Bailey & Matthew Helland, Nichols Kaster, LLP,<br>One Embarcadero Center, Suite 720, San Francisco, CA 94111<br>Phone: 415-277-7235 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No  ☒ MONEY DEMANDED IN COMPLAINT: $ >$75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number: SACV - 739

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                              ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Kent Farmer - Bexar County, Texas |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| BAC Home Loans Servicing, L.P. - Los Angeles County<br>Balboa Insurance Company - Orange County<br>Bank of America, N.A. - Orange County | Banc of America Insurance Services, Inc. - San Francisco County, California |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Count One, Two, Three & Four - Los Angeles and Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  05/13/11

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |